# BOARD OF TRUSTEES OF THE STATE UNIVERSITY OF NEW YORK ET AL. *v.* FOX ET AL.

No. 87–2013.   Argued February 22, 1989—Decided June 29, 1989

SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, STEVENS, O'CONNOR, and KENNEDY, JJ., joined.

BLACKMUN, J., filed a dissenting opinion, in which BRENNAN and MAR-SHALL, JJ., joined, *post*, p. 486.

*O. Peter Sherwood*, Solicitor General of New York, argued the cause for petitioners. With him on the briefs were *Robert Abrams*, Attorney General, *Peter H. Schiff* and *Lawrence S. Kahn*, Deputy Solicitors General, and *Daniel Smirlock*, Assistant Attorney General.

*Henry T. Reath* argued the cause and filed a brief for respondents.*

JUSTICE SCALIA delivered the opinion of the Court.

This case presents the question whether governmental restrictions upon commercial speech are invalid if they go beyond the least restrictive means to achieve the desired end.

I

The State University of New York (SUNY) has promulgated regulations governing the use of school property, including dormitories. One of these, Resolution 66–156 (1979), states:

"No authorization will be given to private commercial enterprises to operate on State University campuses or

---

*Briefs of *amici curiae* urging reversal were filed for the American Council on Education et al. by *Richard D. Marks* and *Sheldon E. Steinbach*; and for the Board of Trustees of the University of Alabama et al. by *Roderick K. Daane, Anthony J. Celebrezze, Jr.*, Attorney General of Ohio, and *Lacy H. Thornburg*, Attorney General of North Carolina.

Briefs of *amici curiae* urging affirmance were filed for the American Advertising Federation, Inc., by *David S. Versfelt, William W. Rogal*, and *Gilbert H. Weil*; for the Landmark Legal Foundation by *Mark J. Bredemeier, Jerald L. Hill*, and *Jonathan W. Emord*; and for the Student Association of the State University of New York, Inc., et al. by *Lanny E. Walter*.

*Marsha S. Berzon* and *Laurence Gold* filed a brief for the American Federation of Labor and Congress of Industrial Organizations as *amicus curiae*.

"in facilities furnished by the University other than to provide for food, legal beverages, campus bookstore, vending, linen supply, laundry, dry cleaning, banking, barber and beautician services and cultural events."

American Future Systems, Inc. (AFS), is a company that sells housewares, such as china, crystal, and silverware, to college students; it markets its products exclusively by the technique popularly called (after the company that pioneered it) "Tupperware parties." This consists of demonstrating and offering products for sale to groups of 10 or more prospective buyers at gatherings assembled and hosted by one of those prospective buyers (for which the host or hostess stands to receive some bonus or reward).

In October 1982, an AFS representative was conducting a demonstration of the company's products in a student's dormitory room at SUNY's Cortland campus. Campus police asked her to leave because she was violating Resolution 66–156. When she refused, they arrested her and charged her with trespass, soliciting without a permit, and loitering. Respondent Fox, along with several fellow students at SUNY/Cortland, sued for declaratory judgment that in prohibiting their hosting and attending AFS demonstrations, and preventing their discussions with other "commercial invitees" in their rooms, Resolution 66–156 violated the First Amendment. AFS joined the students as a plaintiff. The District Court granted a preliminary injunction, *American Future Systems, Inc.* v. *State University of New York College at Cortland*, 565 F. Supp. 754 (NDNY 1983), but, after a trial, found for the university on the ground that the SUNY dormitories did not constitute a public forum for the purpose of commercial activity and that the restrictions on speech were reasonable in light of the dormitories' purpose, 649 F. Supp. 1393 (1986).

A divided panel of the Court of Appeals for the Second Circuit reversed and remanded. 841 F. 2d 1207 (1988). Be-

cause AFS had dropped out of the suit as a party, the only remaining issue was the students' claim that their First Amendment rights had been infringed. Viewing the challenged application of Resolution 66–156 as a restriction on commercial speech, and therefore applying the test articulated in *Central Hudson Gas & Electric Corp.* v. *Public Service Comm'n of New York*, 447 U. S. 557 (1980), the Court of Appeals concluded that it was unclear whether Resolution 66–156 directly advanced the State's asserted interests and whether, if it did, it was the least restrictive means to that end. The Court of Appeals therefore reversed the judgment and remanded to the trial court for "a suitable order" based upon "appropriate findings" on these points.[1] We granted certiorari, 488 U. S. 815 (1988).

## II

In reviewing the reasoning the Court of Appeals used to decide this case,[2] the first question we confront is whether the principal type of expression at issue is commercial speech. There is no doubt that the AFS "Tupperware parties" the students seek to hold "propose a commercial transaction," *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S. 748, 762 (1976), which is the

---

[1] On October 3, 1988, the same day on which we granted certiorari, the District Court issued its decision on remand, striking down Resolution 66–156 because it did not accomplish the State's goals through the least restrictive means possible. 695 F. Supp. 1409 (NDNY). By stipulation of the parties the District Court stayed its mandate and all further proceedings pending our action. See Stipulation, No. 82-CV-1363 (Nov. 23, 1988).

[2] Besides attacking the judgment on the ground that the Court of Appeals misperceived the constitutional principles governing restriction of commercial speech, the State argues that the resolution should be upheld even if the speech here was not commercial, because SUNY dormitories are not a public forum, and the restrictions constitute permissible "time, place, and manner" limitations. Pursuing such an analysis would require us to resolve both legal and factual issues that the Court of Appeals did not address. Since we find that the Court of Appeals must be reversed on the basis of its own analysis, we decline to go further.

test for identifying commercial speech, see *Posadas de Puerto Rico Associates* v. *Tourism Company of Puerto Rico*, 478 U. S. 328, 340 (1986). They also touch on other subjects, however, such as how to be financially responsible and how to run an efficient home. Relying on *Riley* v. *National Federation of Blind of North Carolina, Inc.*, 487 U. S. 781, 796 (1988), respondents contend that here pure speech and commercial speech are "inextricably intertwined," and that the entirety must therefore be classified as noncommercial. We disagree.

*Riley* involved a state-law requirement that in conducting fundraising for charitable organizations (which we have held to be fully protected speech) professional fundraisers must insert in their presentations a statement setting forth the percentage of charitable contributions collected during the previous 12 months that were actually turned over to charities (instead of retained as commissions). In response to the State's contention that the statement was merely compelled commercial speech, we responded that, if so, it was "inextricably intertwined with otherwise fully protected speech," and that the level of First Amendment scrutiny must depend upon "the nature of the speech taken as a whole and the effect of the compelled statement thereon." *Ibid.* There, of course, the commercial speech (if it was that) *was* "inextricably intertwined" because the state law *required* it to be included. By contrast, there is nothing whatever "inextricable" about the noncommercial aspects of these presentations. No law of man or of nature makes it impossible to sell housewares without teaching home economics, or to teach home economics without selling housewares. Nothing in the resolution prevents the speaker from conveying, or the audience from hearing, these noncommercial messages, and nothing in the nature of things requires them to be combined with commercial messages.

Including these home economics elements no more converted AFS' presentations into educational speech, than

opening sales presentations with a prayer or a Pledge of Allegiance would convert them into religious or political speech. As we said in *Bolger* v. *Youngs Drug Products Corp.*, 463 U. S. 60, 67–68 (1983), communications can "constitute commercial speech notwithstanding the fact that they contain discussions of important public issues. . . . We have made clear that advertising which 'links a product to a current public debate' is not thereby entitled to the constitutional protection afforded noncommercial speech. *Central Hudson Gas & Electric Corp.* v. *Public Service Comm'n of New York*, 447 U. S., at 563, n. 5." We discuss this case, then, on the basis that commercial speech is at issue.

We have described our mode of analyzing the lawfulness of restrictions on commercial speech as follows:

> "At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest." *Central Hudson, supra,* at 566.

The Court of Appeals held, and the parties agree, that the speech here proposes a lawful transaction, is not misleading, and is therefore entitled to First Amendment protection. The Court of Appeals also held, and we agree, that the governmental interests asserted in support of the resolution are substantial: promoting an educational rather than commercial atmosphere on SUNY's campuses, promoting safety and security, preventing commercial exploitation of students, and preserving residential tranquility. The Court of Appeals did not decide, however, whether Resolution 66–156 directly advances these interests, and whether the regulation it imposes

is more extensive than is necessary for that purpose. As noted earlier, it remanded to the District Court for those determinations. We think that remand was correct, since further factual findings had to be made. It is the terms of the remand, however, that are the major issue here—specifically, those pertaining to the last element of the *Central Hudson* analysis. The Court of Appeals in effect instructed the District Court that it could find the resolution to be "not more extensive than is necessary" only if it is the "least restrictive measure" that could effectively protect the State's interests.

Our cases have repeatedly stated that government restrictions upon commercial speech may be no more broad or no more expansive than "necessary" to serve its substantial interests, see, *e. g., Central Hudson,* 447 U. S., at 566; *Metromedia, Inc.* v. *San Diego,* 453 U. S. 490, 507–508 (1981) (plurality opinion); *In re R. M. J.,* 455 U. S. 191, 203 (1982); *Zauderer* v. *Office of Disciplinary Counsel of Supreme Court of Ohio,* 471 U. S. 626, 644 (1985); *Posadas de Puerto Rico Associates* v. *Tourism Company of Puerto Rico, supra,* at 343; *San Francisco Arts & Athletics, Inc.* v. *United States Olympic Committee,* 483 U. S. 522, 535 (1987); *Shapero* v. *Kentucky Bar Assn.,* 486 U. S. 466, 472 (1988). If the word "necessary" is interpreted strictly, these statements would translate into the "least-restrictive-means" test used by the Court of Appeals here. There are undoubtedly formulations in some of our cases that support this view—for example, the statement in *Central Hudson* itself that "if the governmental interest could be served as well by a more limited restriction on commercial speech, the excessive restrictions cannot survive." 447 U. S., at 564. We have indeed assumed in dicta the validity of the "least-restrictive-means" approach. See *Zauderer, supra,* at 644, 651, n. 14. However, as we long ago had occasion to observe with respect to the Necessary and Proper Clause of the Constitution, see *McCulloch* v. *Maryland,* 4 Wheat. 316 (1819), the word "nec-

essary" is sometimes used more loosely. And other formulations in our commercial speech cases support a more flexible meaning for the *Central Hudson* test. In *In re R. M. J.*, for example, we said that restrictions designed to prevent deceptive advertising must be "narrowly drawn," 455 U. S., at 203, and "no more extensive than reasonably necessary to further substantial interests," *id.*, at 207; see also *id.*, at 203. We repeated the latter formulation last Term in *Shapero* v. *Kentucky Bar Assn.*, *supra*, at 472. In *San Francisco Arts & Athletics, Inc.* v. *United States Olympic Committee*, *supra*, at 537, n. 16, we said that the application of the *Central Hudson* test was "substantially similar" to the application of the test for validity of time, place, and manner restrictions upon protected speech—which we have specifically held does *not* require least restrictive means. *Clark* v. *Community for Creative Non-Violence*, 468 U. S. 288 (1984); see also *infra*, at 478. Whatever the conflicting tenor of our prior dicta may be, we now focus upon this specific issue for the first time, and conclude that the reason of the matter requires something short of a least-restrictive-means standard.

Our jurisprudence has emphasized that "commercial speech [enjoys] a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values," and is subject to "modes of regulation that might be impermissible in the realm of noncommercial expression." *Ohralik* v. *Ohio State Bar Assn.*, 436 U. S. 447, 456 (1978). The ample scope of regulatory authority suggested by such statements would be illusory if it were subject to a least-restrictive-means requirement, which imposes a heavy burden on the State. See *Shelton* v. *Tucker*, 364 U. S. 479, 488 (1960); see also *Nixon* v. *Administrator of General Services*, 433 U. S. 425, 467 (1977). Cf. *Widmar* v. *Vincent*, 454 U. S. 263, 279, n. 3 (1981) (STEVENS, J., concurring in judgment).

We have refrained from imposing a least-restrictive-means requirement—even where core political speech is at issue—in assessing the validity of so-called time, place, and manner re-

strictions.   We uphold such restrictions so long as they are
"narrowly tailored" to serve a significant governmental inter-
est, *Clark* v. *Community for Creative Non-Violence, supra,*
at 293; *City Council of Los Angeles* v. *Taxpayers for Vin-
cent,* 466 U. S. 789, 808 (1984), a standard that we have not
interpreted to require elimination of all less restrictive alter-
natives, see, *e. g., Community for Creative Non-Violence,*
*supra,* at 299; *Regan* v. *Time, Inc.,* 468 U. S. 641, 657 (1984)
(plurality opinion) ("The less-restrictive-alternative analysis
. . . has never been a part of the inquiry into the validity of a
time, place, and manner regulation").   Similarly with re-
spect to government regulation of expressive conduct, includ-
ing conduct expressive of political views.   In requiring that
to be "narrowly tailored" to serve an important or substantial
state interest, see *Community for Creative Non-Violence,*
*supra,* at 293, 298 (discussing *United States* v. *O'Brien,* 391
U. S. 367 (1968)); *Taxpayers for Vincent, supra,* at 804–805,
we have not insisted that there be no conceivable alternative,
but only that the regulation not "burden substantially more
speech than is necessary to further the government's legiti-
mate interests," *Ward* v. *Rock Against Racism,* 491 U. S.
781, 799 (1989).   And we have been loath to second-guess
the Government's judgment to that effect.   See *Community*
*for Creative Non-Violence, supra,* at 299; *United States* v.
*Albertini,* 472 U. S. 675, 689 (1985).   While these two lines
of authority do not of course govern here, we think it would
be incompatible with the asserted "subordinate position [of
commercial speech] in the scale of First Amendment values"
to apply a more rigid standard in the present context.[3]

---

[3] It is interesting that in the expressive conduct and time, place, and
manner contexts, where, as just discussed, it is now well established that a
least-restrictive-means standard does not apply, we have sometimes used
the same sort of "necessity" language which is the asserted precedential
authority for that standard in commercial speech cases.   For example, in
*United States* v. *O'Brien,* 391 U. S. 367, 376–377 (1968), we stated that re-
strictions on expressive conduct must be "no greater than essential."   And
in *City Council of Los Angeles* v. *Taxpayers for Vincent,* 466 U. S. 789,

None of our cases invalidating the regulation of commercial speech involved a provision that went only marginally beyond what would adequately have served the governmental interest. To the contrary, almost all of the restrictions disallowed under *Central Hudson*'s fourth prong have been substantially excessive, disregarding "far less restrictive and more precise means." *Shapero* v. *Kentucky Bar Assn.*, 486 U. S., at 476. See, *e. g.*, *Zauderer* v. *Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U. S. 626 (1985); *In re R. M. J.*, 455 U. S. 191 (1982); *Bates* v. *State Bar of Arizona*, 433 U. S. 350 (1977). On the other hand, our decisions *upholding* the regulation of commercial speech cannot be reconciled with a requirement of least restrictive means. In *Posadas*, for example, where we sustained Puerto Rico's blanket ban on promotional advertising of casino gambling to Puerto Rican residents, we did not first satisfy ourselves that the governmental goal of deterring casino gambling could not adequately have been served (as the appellant contended) "not by suppressing commercial speech that might *encourage* such gambling, but by promulgating additional speech designed to *discourage* it." 478 U. S., at 344. Rather, we said that it was "up to the legislature to decide" that point, so long as its judgment was reasonable. *Ibid.* Similarly, in *Metromedia, Inc.* v. *San Diego*, 453 U. S., at 513 (plurality opinion), where we upheld San Diego's complete ban of off-site billboard advertising, we did not inquire whether *any* less restrictive measure (for example, controlling the size and appearance of the signs) would suffice to meet the city's concerns for traffic safety and esthetics. It was enough to conclude that the ban was "perhaps the only effective approach." *Id.*, at 508. And in *San Francisco Arts & Athletics, Inc.* v. *United States Olympic Committee*, 483 U. S., at 539, it was enough to uphold the restrictions

810 (1984), we sustained the time, place, and manner restriction because it "curtail[ed] no more speech than [was] necessary to accomplish its purpose."

placed on commercial speech by a federal trademark statute that they were "not broader than Congress reasonably could have determined to be necessary."

In sum, while we have insisted that "'the free flow of commercial information is valuable enough to justify imposing on would-be regulators the costs of distinguishing . . . the harmless from the harmful,'" *Shapero, supra,* at 478, quoting *Zauderer, supra,* at 646, we have not gone so far as to impose upon them the burden of demonstrating that the distinguishment is 100% complete, or that the manner of restriction is absolutely the least severe that will achieve the desired end. What our decisions require is a "'fit' between the legislature's ends and the means chosen to accomplish those ends," *Posadas, supra,* at 341—a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is "in proportion to the interest served," *In re R. M. J., supra,* at 203; that employs not necessarily the least restrictive means but, as we have put it in the other contexts discussed above, a means narrowly tailored to achieve the desired objective. Within those bounds we leave it to governmental decisionmakers to judge what manner of regulation may best be employed.

We reject the contention that the test we have described is overly permissive. It is far different, of course, from the "rational basis" test used for Fourteenth Amendment equal protection analysis. See, *e. g., Railway Express Agency, Inc.* v. *New York,* 336 U. S. 106, 109–110 (1949). There it suffices if the law could be thought to further a legitimate governmental goal, without reference to whether it does so at inordinate cost. Here we require the government goal to be substantial, and the cost to be carefully calculated. Moreover, since the State bears the burden of justifying its restrictions, see *Zauderer, supra,* at 647, it must affirmatively establish the reasonable fit we require. By declining to impose, in addition, a least-restrictive-means requirement, we

take account of the difficulty of establishing with precision the point at which restrictions become more extensive than their objective requires, and provide the Legislative and Executive Branches needed leeway in a field (commercial speech) "traditionally subject to governmental regulation," *Ohralik* v. *Ohio State Bar Assn.*, 436 U. S., at 455–456. Far from eroding the essential protections of the First Amendment, we think this disposition strengthens them. "To require a parity of constitutional protection for commercial and noncommercial speech alike could invite dilution, simply by a leveling process, of the force of the Amendment's guarantee with respect to the latter kind of speech." *Id.*, at 456.

## III

Finally, we must address respondents' objection that, even if the principal First Amendment interests they asserted involve commercial speech and have not improperly been restricted, Resolution 66–156 must nonetheless be invalidated as overbroad, since it prohibits as well fully protected, *non*commercial speech. Although it is true that overbreadth analysis does not normally apply to commercial speech, see *Bates* v. *State Bar of Arizona, supra,* at 380–381; *Ohralik, supra,* at 462, n. 20; *Hoffman Estates* v. *The Flipside, Hoffman Estates, Inc.*, 455 U. S. 489, 496–497 (1982), that means only that a statute whose overbreadth consists of unlawful restriction of commercial speech will not be facially invalidated on that ground—our reasoning being that commercial speech is more hardy, less likely to be "chilled," and not in need of surrogate litigators. See *Bates* v. *State Bar of Arizona, supra; Ohralik* v. *Ohio State Bar Assn., supra.* Here, however, although the principal attack upon the resolution concerned its application to commercial speech, the alleged overbreadth (if the commercial-speech application is assumed to be valid) consists of its application to *non*commercial speech, and that is what counts. Cf. *Bigelow* v. *Virginia,*

421 U. S. 809, 815–819 (1975); *Hoffman Estates* v. *The Flipside, Hoffman Estates, Inc., supra,* at 495–497.

On the record before us here, Resolution 66–156 must be deemed to reach some noncommercial speech. A stipulation entered into by the university stated that the resolution reaches any invited speech "where the end result is the intent to make a profit by the invitee." App. 87. More specifically, a SUNY deponent authorized to speak on behalf of the university under Federal Rule of Civil Procedure 30(b)(6) testified that the resolution would prohibit for-profit job counseling in the dormitories, *id.,* at 133; and another SUNY official testified that it would prohibit tutoring, legal advice, and medical consultation provided (for a fee) in students' dormitory rooms, see *id.,* at 162, 181–183. While these examples consist of speech for a profit, they do not consist of speech that *proposes* a commercial transaction, which is what defines commercial speech, see *Virginia Pharmacy Board,* 425 U. S., at 761 (collecting cases). Some of our most valued forms of fully protected speech are uttered for a profit. See, *e. g., New York Times Co.* v. *Sullivan,* 376 U. S. 254 (1964); *Buckley* v. *Valeo,* 424 U. S. 1 (1976) *(per curiam).*

In addition to being clear about the difference between commercial and noncommercial speech, it is also important to be clear about the difference between an as-applied and an overbreadth challenge. Quite obviously, the rule employed in as-applied analysis that a statute regulating commercial speech must be "narrowly tailored," which we discussed in the previous portion of this opinion, prevents a statute from being overbroad. The overbreadth doctrine differs from that rule principally in this: The person invoking the commercial-speech narrow-tailoring rule asserts that *the acts of his that are the subject of the litigation* fall outside what a properly drawn prohibition could cover. As we put it in *Ohralik* v. *Ohio State Bar Assn.,* 436 U. S., at 462, he "attacks the validity of [the statute] not facially, but as applied to his acts of solicitation," whereas the person invoking overbreadth "may

challenge a statute that infringes protected speech even if the statute constitutionally might be applied to him," *id.*, at 462, n. 20. Thus in *Bates*, the case that established the nonapplicability of overbreadth analysis to commercial speech, we said that appellants could not "expect to benefit [from the statute's overinclusiveness] regardless of the nature of their acts," 433 U. S., at 380, and framed as the relevant question "Is . . . *appellants' advertisement* outside the scope of basic First Amendment protection?" *id.*, at 381 (emphasis added). Where an overbreadth attack is successful, the statute is obviously invalid in *all* its applications, since every person to whom it is applied can defend on the basis of the same overbreadth. A successful attack upon a commercial-speech restriction on narrow-tailoring grounds, by contrast, does not assure a defense to those whose own commercial solicitation *can* be constitutionally proscribed—though obviously the rationale of the narrow-tailoring holding may be so broad as to render the statute effectively unenforceable. See, *e. g.*, *Central Hudson Gas & Electric Corp.* v. *Public Service Comm'n of New York*, 447 U. S. 557 (1980); *Shapero* v. *Kentucky Bar Assn.*, 486 U. S. 466 (1988).

Ordinarily, the principal advantage of the overbreadth doctrine for a litigant is that it enables him to benefit from the statute's unlawful application *to someone else.* Respondents' invocation of the doctrine in the present case is unusual in that the asserted extensions of Resolution 66–156 beyond commercial speech that are the basis for their overbreadth challenge are not hypothetical applications to third parties, but applications to the student respondents themselves, which were part of the subject of the complaint and of the testimony adduced at trial. Perhaps for that reason, the overbreadth issue was not (in the District Court at least) set forth in the normal fashion—viz., by arguing that even if the commercial applications of the resolution are valid, its noncommercial applications are not, and this invalidates its commercial applications as well. Rather, both commercial and

(less prominently) noncommercial applications were attacked on their own merit—with no apparent realization, we might add, on the part of either respondents or the District Court, that separate categories of commercial speech and noncommercial speech, rather than simply various types of commercial speech, were at issue.

The First Amendment doctrine of overbreadth was designed as a "departure from traditional rules of standing," *Broadrick* v. *Oklahoma*, 413 U. S. 601, 613 (1973), to enable persons who are themselves unharmed by the defect in a statute nevertheless "to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court," *id.*, at 610. We see no reason, however, why the doctrine may not be invoked in the unusual situation, as here, where the plaintiff has *standing* to challenge *all* the applications of the statute he contends are unlawful, but his challenge to *some* of them (here, the commercial applications of the statute, assuming for the moment they are valid) will fail unless the doctrine of overbreadth is invoked.   It would make little sense to reject these plaintiffs' as-applied attack upon the statute's restriction of commercial speech (on the ground that in its commercial-speech applications the statute *is* narrowly tailored) and to preclude them from attacking that restriction on grounds that the statute is overbroad (because they have standing to attack its overbroad applications directly and therefore cannot invoke the overbreadth doctrine)—and then, next week, to permit some person whose noncommercial speech is *not* restricted (so that he has no standing to attack that aspect of the statute directly) to *succeed* in his attack on the commercial applications because the statute is overbroad. In other words, while the overbreadth doctrine was born as an expansion of the law of standing, it would produce absurd results to limit its application strictly to that context.

It is not the usual judicial practice, however, nor do we consider it generally desirable, to proceed to an overbreadth

issue unnecessarily—that is, before it is determined that the statute would be valid as applied. Such a course would convert use of the overbreadth doctrine from a necessary means of vindicating the plaintiff's own right not to be bound by a statute that is unconstitutional into a means of mounting gratuitous wholesale attacks upon state and federal laws. Moreover, the overbreadth question is ordinarily more difficult to resolve than the as-applied, since it requires determination whether the statute's overreach is *substantial,* not only as an absolute matter, but "judged in relation to the statute's plainly legitimate sweep," *Broadrick* v. *Oklahoma, supra,* at 615, and therefore requires consideration of many more applications than those immediately before the court. Thus, for reasons relating both to the proper functioning of courts and to their efficiency, the lawfulness of the particular application of the law should ordinarily be decided first.

In the present case, it has not yet been properly determined that the restrictions on respondents' commercial speech are valid as applied. In fact, neither the legal issues nor the factual questions involved in that portion of the case have been separately addressed by either of the courts below. As we have described, the District Court held that the restrictions on both types of speech were valid without specifically considering (or apparently even recognizing the presence of) noncommercial speech; and the Court of Appeals reversed, again without separate analysis of noncommercial speech, for failure to apply the least-restrictive-means test—which, as we have held, was error. We decline to resolve those as-applied challenges here, not only for reasons of economy but also because a holding for respondents would produce a final judgment in their favor, according them more relief than they obtained from the Court of Appeals (which entered only a remand). Such a result is generally impermissible where, as here, respondents have not filed a cross-petition for certiorari. See R. Stern, E. Gressman, & S. Shapiro, Supreme Court Practice 382–387 (6th ed. 1986). For the same rea-

sons, and indeed *a fortiori,* we decline to resolve here the issue normally subsequent to rejection of the as-applied challenge, whether the statute is overbroad. We remand this case for determination, pursuant to the standards described above, of the validity of this law's application to the commercial and noncommercial speech that is the subject of the complaint; and, if its application to speech in either such category is found to be valid, for determination whether its substantial overbreadth nonetheless makes it unenforceable.

*   *   *

The judgment of the Court of Appeals is reversed, and the case remanded for further proceedings consistent with this opinion.

*So ordered.*

JUSTICE BLACKMUN, with whom JUSTICE BRENNAN and JUSTICE MARSHALL join, dissenting.

The majority holds that "least-restrictive-means" analysis does not apply to commercial-speech cases, a holding it is able to reach only by recasting a good bit of contrary language in our past cases.[1] I would have preferred to leave the least-restrictive-means question to another day, and dispose of the case on the alternative—and, in this case, narrower—ground

---

[1] The majority concedes that it must repudiate the Court's repeated assertion that regulation of commercial speech may be "not more extensive than is necessary to serve [a substantial governmental] interest" in order to decide that "least-restrictive-means" analysis does not apply to commercial-speech cases. *Central Hudson Gas & Electric Corp.* v. *Public Service Comm'n of New York,* 447 U. S. 557, 566 (1980); see *ante,* at 476–477. Indeed, to reach its result, the majority must characterize as "dicta" the Court's reference to "least-restrictive-means" analysis in *Zauderer* v. *Office of Disciplinary Counsel of Supreme Court of Ohio,* 471 U. S. 626, 644 (1985), see *ante,* at 476, although this reference seems integral to the Court's holding that the ban on attorney advertising at issue there was not "necessary to the achievement of a substantial governmental interest."

of overbreadth.[2]   While respondents failed to file a cross-petition on the issue, this omission is not a jurisdictional barrier, see *Berkemer* v. *McCarty*, 468 U. S. 420, 435–436, n. 23 (1984), and is more than outweighed by the opportunity the overbreadth claim affords to avoid a substantial revision of the Court's precedents in the area of commercial speech.

That Resolution 66–156 is substantially overbroad in its potential application to noncommercial speech is readily apparent.   As the university interprets the resolution, any speech in a dormitory room for which the speaker receives a profit is speech by a "private commercial enterprise," prohibited by the resolution.   See *ante*, at 482–483.   As the majority correctly observes, *ante*, at 482, the resolution so interpreted prohibits not only commercial speech (*i. e.*, speech proposing a commercial transaction), but also a wide range of speech that receives the fullest protection of the First Amendment. We have been told by authoritative university officials that the resolution prohibits a student from meeting with his physician or lawyer in his dorm room, if the doctor or lawyer is paid for the visit.   We have similarly been told that the resolution prohibits a student from meeting with a tutor or job counselor in his dorm room.   *Ibid.*   Presumably, then, the resolution also forbids a music lesson in the dorm, a form of tutoring.   A speech therapist would be excluded, as would an art teacher or drama coach.

---

[2] Although at times we have suggested that as-applied challenges should be decided before overbreadth challenges, see *Brockett* v. *Spokane Arcades, Inc.*, 472 U. S. 491 (1985), we have often felt free to do otherwise, see *Board of Airport Comm'rs of Los Angeles* v. *Jews for Jesus, Inc.*, 482 U. S. 569 (1987); *Houston* v. *Hill*, 482 U. S. 451 (1987).   Here, the Court has a choice between deciding the general question whether "governmental restrictions upon commercial speech are invalid if they go beyond the least restrictive means to achieve the desired end," *ante*, at 471, and the specific question whether this particular resolution is void because of unconstitutional overbreadth.   Surely, the former question is the more sweeping one in terms of constitutional law.

A public university cannot categorically prevent these fully protected expressive activities from occurring in a student's dorm room. The dorm room is the student's residence for the academic term, and a student surely has a right to use this residence for expressive activities that are not inconsistent with the educational mission of the university or with the needs of other dorm residents (the distinction between tuba lessons and classical guitar lessons, or between drawing lessons and stone sculpture lessons, comes immediately to mind). See *Tinker* v. *Des Moines Independent Community School District,* 393 U. S. 503 (1969); cf. *Kovacs* v. *Cooper,* 336 U. S. 77 (1949). It cannot plausibly be asserted that music, art, speech, writing, or other kinds of lessons are inconsistent with the educational mission of the university, or that a categorical prohibition of these activities is the "least-restrictive means" (or is even "narrowly tailored") to protect the interests of other dorm residents. Nor is there any possible basis for believing that in-dorm psychological or vocational counseling is incompatible with the university's objectives or the needs of other residents. Thus, the broad reach of Resolution 66–156 cannot be squared with the dictates of the First Amendment.

More important, the resolution's overbreadth is undoubtedly "substantial" in relation to whatever legitimate scope the resolution may have. See *Houston* v. *Hill,* 482 U. S. 451, 458 (1987); *Board of Airport Comm'rs of Los Angeles* v. *Jews for Jesus, Inc.,* 482 U. S. 569, 574 (1987). Even assuming that the university may prohibit *all* forms of commercial speech from a student's dorm (a proposition that is by no means obvious under our precedents),[3] the resolution's impermissible restrictions upon fully protected speech amount to a considerable portion of the resolution's potential applica-

---

[3] For example, it is highly doubtful that the university could prohibit students from inviting to their rooms a representative from a birth-control clinic, from whom the students seek information about services the clinic provides for a fee. Cf. *Bigelow* v. *Virginia,* 421 U. S. 809, 822 (1975).

tions. Because the resolution makes no effort to distinguish between commercial and noncommercial speech, or to narrow its scope to the perceived evil it was intended to address, see *Thornhill* v. *Alabama*, 310 U. S. 88, 97 (1940), it sweeps within its reach far more protected expression than is tolerable under the First Amendment.

In this respect, the resolution here is equivalent to the one struck down on overbreadth grounds in *Jews for Jesus*, *supra*, a resolution that banned all "First Amendment activities" within the central terminal area of a major urban airport. By prohibiting *all* speech in a dorm room if the speaker receives a fee, the resolution in this case, like the resolution in *Jews for Jesus*, indiscriminately proscribes an entire array of wholly innocuous expressive activity, and for that reason is substantially overbroad. I therefore would hold Resolution 66–156 unconstitutional on its face now, in order to avoid chilling protected speech during the pendency of proceedings on remand.