MANION, Circuit Judge,
dissenting.
By prohibiting a class of weapons commonly used .throughout the country, Highland Park’s ordinance infringes upon the rights of its citizens to keep weapons in their homes for the purpose of defending themselves, their families, and their property. Both the ordinance and this court’s opinion upholding it are directly at odds with the central holdings of Heller and McDonald: that the Second Amendment protects a personal right to keep arms for *413 lawful purposes, most notably for self-defense within the home. District of Columbia v. Heller, 554 U.S. 570, 635, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008); McDonald v. City of Chicago, 561 U.S. 742, 767, 780, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010). For the following reasons, I respectfully dissent.
Unlike public life where the cities and states have broad authority to regulate, the ultimate decision for what constitutes the most effective means of defending one’s home, family, and property resides in individual citizens and not in the government. The Heller and McDonald opinions could not be clearer on this matter. Heller, 554 U.S. at 635, 128 S.Ct. 2783; McDonald, 561 U.S. at 780, 130 S.Ct. 3020. The extent of danger — real or imagined— that a citizen faces at home is a matter only that person can assess in full.
To be sure, assault rifles and large capacity magazines are dangerous. But their ability to project large amounts of force accurately is exactly why they are an attractive means of self-defense. While most persons do not require extraordinary means to defend their homes, the fact remains that some do. Ultimately, it is up to the lawful gun owner and not the government to decide these matters. To limit self-defense to only those methods acceptable to the government is to effect an enormous transfer of authority from the citizens of this country to the government — a result directly contrary to our constitution and to our political tradition. The rights contained in the Second Amendment are “fundamental” and “necessary to our system of ordered liberty.” McDonald, 561 U.S. at 778, 130 S.Ct. 3020. The government recognizes these rights; it does not confer them.
Fundamentally, I disagree with the court’s reading of United States v. Miller, 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206 (1939), as it pertains to the nature of the rights recognized by the Second Amendment. Long ago, in Miller, the Supreme Court expressly tied Second Amendment rights to one’s association with a state militia. In Heller, the District of Columbia relied on this holding from Miller as justification for an ordinance restricting the rights of its citizens to keep and use handguns. 554 U.S. at 577, 587, 128 S.Ct. 2783. The Supreme Court disagreed. Id. at 622, 128 S.Ct. 2783. Indeed, the central holding of Heller is that citizens have an individual right to keep and bear firearms that does not depend upon any association with a militia. In so holding, Heller effectively laid to rest the notion of collective Second Amendment rights, and then McDonald placed a wreath on its grave.
Here, the court comes not to bury Miller but to exhume it. To that end, it surveys the landscape of firearm regulations as if Miller were still the controlling authority and Heller were a mere gloss on it. The court’s reading culminates in a novel test: whether the weapons in question were “common at the time of ratification” or have “some reasonable relationship to the preservation or efficiency of a well regulated militia,” and “whether law-abiding citizens retain adequate means of self-defense.” Ante at 410-11.
The problem is Heller expressly disclaimed two of the three aspects of this test; and it did so not as a matter of simple housekeeping, but as an immediate consequence of its central holding. It held as “bordering on the frivolous” arguments that recognized a right to bear only those arms in existence at the time of ratification. Heller, 554 U.S. at 582, 128 S.Ct. 2783 (“Some have made the argument, bordering on the frivolous, that only those arms in existence in the 18th century are protected by the Second Amendment.”). Likewise, it expressly overruled any read *414 ing of the Second Amendment that conditioned the rights to keep and bear arms on one’s association with a militia. Id. at 612, 128 S.Ct. 2783. (“It is not possible to read this as discussing anything other than an individual right unconnected to militia service.”). For this reason, there is no way to square this court’s holding with the clear precedents of Heller and McDonald.
Heller and McDonald
We turn to the controlling precedents. Although the Heller decision is of recent vintage, the rights recognized by it — for individual citizens to keep and bear arms lawfully — are not. Heller certainly did not create them in 2008, nor did the Second Amendment' in 1791. These rights are “fundamental” and “deeply rooted in this Nation’s history and tradition.” McDonald, 561 U.S. at 768, 130 S.Ct. 3020. They are natural rights that pre-existed the Second Amendment. Heller, 554 U.S. at 592, 128 S.Ct. 2783 (quoting United States v. Cruikshank, 92 U.S. 542, 553, 23 L.Ed. 588 (1876) that the right to carry weapons is not “dependent upon [the Second Amendment] for its existence.”); Ezell v. City of Chicago, 651 F.3d 684, 700 (7th Cir.2011). This understanding persisted and was shared by the Framers of the Fourteenth Amendment, who counted these among the “fundamental rights necessary to our system of ordered liberty.” McDonald, 561 U.S. at 778, 130 S.Ct. 3020. These rights exist not merely in the abstract, but are exercised on a daily basis; indeed, a detailed list of the various ways in which Americans use weapons lawfully would be prohibitively long.
Which brings us to Friedman, our plaintiff. He is a resident of Highland Park who owns an AR rifle and large capacity magazines of the types prohibited by the ordinance. Friedman contends — and the city does not contest — that he keeps the weapons in his home for the defense of his family. Prior to the passage of the ordinance, he used these weapons lawfully. Now, under the terms of the ordinance, Friedman has ninety days to remove the weapons beyond Highland Park’s city limits or to surrender them to the Chief of Police. § 136.005(D)(1), (3). Should he fail to do so, he faces a misdemeanor conviction punishable by up to six months in jail and a fine of between $500 and $1,000. Id. at § (F).

The Framework

In Ezell, we stated that a court must first identify whether the regulated activity falls within the scope of the Second Amendment. 651 F.3d at 701. However, where, as here, the activity is directly tied to specific classes of weapons, we are faced with an additional threshold matter: whether the classes of weapons regulated are commonly used by law-abiding citizens. If the weapons in question (assault rifles and high-capacity magazines) are not commonly used by law-abiding citizens, then our inquiry ends as there is no Second Amendment protection and the regulation is presumed to be lawful.[1]
If the weapons are covered by the Second Amendment, we then examine whether the asserted right (i.e., the activity affected by the regulation) is likewise *415 covered. To do this, we examine how the asserted right was publicly understood when the Fourteenth Amendment was ratified (or Second Amendment in the case of federal regulation) to discern whether the right (or some analogue) has been exercised historically. Id. at 702. This answer requires a textual and historical inquiry into the original meaning of the Second Amendment. Id. (citing Heller, 554 U.S. at 634-35, 128 S.Ct. 2783). Significantly, the plaintiff need not demonstrate the absence of regulation in order to prevail; the burden rests squarely on the government to establish that the activity has been subject to some measure of regulation. Id.
Finally, if we conclude that the weapons and asserted right at issue are covered by the Second Amendment, then we must assign a level of scrutiny appropriate to the right regulated and determine whether the regulation survives such scrutiny. Ezell, 651 F.3d at 702-03. Conversely, if the activity falls outside of the scope of the Second Amendment as understood at the relevant historical moment (1868 with the passage of the Fourteenth Amendment), the regulated activity is categorically unprotected and our inquiry ends. Id. at 703.
In summary, this framework involves up to three separate steps for a reviewing court. A shorthand of it runs as follows:
1.determine whether the weapon is commonly used by law-abiding citizens;
2. review the original public meaning of the asserted right (i.e. the regulated activity); and, if both the weapon and asserted right are covered;
3. assign and apply a standard of scrutiny.
Having established the appropriate framework, it is time to examine Highland Park’s ordinance in light of the Second Amendment.

Common Use

The regulated weapons: In Miller, the Supreme Court upheld a prohibition against short-barreled shotguns because the Second Amendment did not protect those weapons that were not typically possessed as ordinary military equipment for use in a state militia. 307 U.S. at 178, 59 S.Ct. 816. The “common use” test is the offspring of this decision and asks whether a particular weapon is commonly used by law-abiding citizens for lawful purposes.[2] Heller jettisoned Miller’s requirement of a nexus between the weapon and military equipment, but otherwise adopted the test with a focus on whether the weapon in question has obtained common use by law abiding citizens. Heller, 554 U.S. at 623, 627, 128 S.Ct. 2783.
Here, the evidentiary record is unequivocal: a statistically significant amount of gun owners such as Friedman use semiautomatic weapons and high-capacity magazines for lawful purposes.[3] This evidence is sufficient to demonstrate that these *416 weapons are commonly used and are not unusual. In other words, they are covered by the Second Amendment. Whether or how people might use these weapons for illegal purposes provides a basis for a state to regulate them, but it has no bearing on whether the Second Amendment covers them. Unfortunately, the court effectively inverts this equation and considers first the potential illegal uses (here: catastrophic public shootings) and then doubles back to determine whether attendant lawful use by ordinary citizens might be sufficient to warrant some type of Second Amendment protection.
An example: At oral argument, there was much discussion about various longstanding regulations prohibiting such weapons as machine guns. The crux of this discussion was whether machine guns would have satisfied the common use test during the 1930s when they were the weapon of choice among gangsters in Chicago. But this misses the point: it matters not whether fifty or five thousand mob enforcers used a particular weapon, the question is whether a critical mass of law-abiding citizens did. In the case of machine guns, nobody has argued, before or since, that ordinary citizens used these weapons for lawful purposes, and so they have been rightly deemed not to fall within the ambit of the Second Amendment. Had there been even a small amount of citizens who used them for lawful purposes, then the Second Amendment might have covered them. The fact that gangsters used them to terrorize people might have served as ample justification to regulate them (or even prohibit them outright), but it has no bearing on whether they are covered under the Second Amendment.[4]
The court also objected because the common-use test is a circular one.[5] Perhaps so, but the law is full of such tests, and this one is no more circular than the “reasonable expectation of privacy” or the “reasonable juror.” The fact that a statistically significant number of Americans use AR-type rifles and large-size magazines demonstrates ipso facto that they are used for lawful purposes. Our inquiry should have ended here: the Second Amendment covers these weapons.

Original Meaning of Asserted Rights

We follow Heller’s example examining the original meaning of the right asserted. *417 554 U.S. at 576, 128 S.Ct. 2783. Heller examined the right to keep arms as it was understood in 1791 when the Second Amendment was ratified. Significantly, Heller expressly rejected the view that the Second Amendment contained a unitary right and instead noted that lawmakers of the founding period routinely grouped multiple, related, rights under a singular right. Heller, 554 U.S. at 591, 128 S.Ct. 2783. Because the rights in the Second Amendment are many and varied, a court must identify the specific right implicated by a regulation.
To examine the scope of the right, we must first identify the regulated activity. Here, the relevant section of the ordinance provides that: “No person shall manufacture, sell, offer or display for sale, give, lend, transfer ownership of, acquire or possess any assault weapon or large capacity magazine.” § 136.005(B). Plaintiffs do not challenge the provisions associated with the manufacture or sale of such weapons in Highland Park and so we need not address the scope of those rights. Instead, we isolate our attention on the language in the statute that forbids a citizen from acquiring or possessing any assault weapon or large-capacity magazine.

The Right to Keep Arms v. The Right to Bear Arms

Heller defined the term “to keep arms” to mean to “have weapons,” and “to bear arms” as to “carr[y]” weapons. 554 U.S. at 582, 589, 128 S.Ct. 2783. Though similar, these activities are not identical; for instance, an ordinance that prohibits the carriage or use of weapons but not outright possession would not implicate the right to keep arms, but only the right to bear them in certain locations. Highland Park’s ordinance implicates both rights. Leaving aside the other prohibitions, the ordinance prohibits the “acquisition] or possession of] any assault weapon or large capacity magazine.” § 136.005(B). Notably absent from this provision is any qualifying language: all forms of possession are summarily prohibited. Other laws notwithstanding, the ordinance makes no distinction between storing large-capacity magazines in a locked safe at home and carrying a loaded assault rifle while walking down Main Street. Both constitute “possession” and are prohibited outright.
Of course, our inquiry centers on the understanding of the right to keep arms in 1868 when the Fourteenth Amendment became law. Fortunately, we need not engage in original historical analysis because the Supreme Court in McDonald has done so on this exact question — albeit in the context of an ordinance restricting the right to keep handguns in the home. McDonald concluded that the right to keep a weapon in one’s home for the purposes of self-defense is the broadest right under the Second Amendment. It noted:
Self-defense is a basic right, recognized by many legal systems from ancient times to the present day, and in Heller, we held that individual self-defense is ‘the central component’ of the Second Amendment right.... Explaining that ‘the need for defense of self, family, and property is most acute’ in the home ... we found that this right applies to handguns because they are ‘the most preferred firearm in the nation to ‘keep’ and use for the protection of one’s home and family.... Thus, we concluded, citizens must be permitted to use [handguns] for the core lawful purpose of self-defense.
McDonald, 561 U.S. at 767-68, 130 S.Ct. 3020 (citing Heller, 554 U.S. at 630) (emphasis in original).
Rather than merely regulate how weapons are to be stored at home, Highland Park’s ordinance goes further than the *418 one that the Court found unconstitutional in Heller: it prohibits any form of possession of these weapons. It is immaterial to this inquiry that the regulations targeted different classes of weapons (handguns versus assault rifles and large-capacity magazines) because the issue at this step involves the scope of the protected activity — the right to keep arms for self-defense — not the class of weapons involved with such activity; that inquiry is relevant at the final step in examining the purpose for the regulation.
If the right to keep arms in the home for the purpose of self-defense obtains the broadest protections under the Second Amendment, it follows by implication that regulations affecting the rights to carry (bear) arms outside of the home are given greater deference. Indeed, the vast majority of the longstanding regulations deemed “presumptively lawful” by Heller and McDonald are regulations against the use and carriage of weapons. See, e.g., Heller, 554 U.S. at 626-27, 128 S.Ct. 2783; Heller v. District of Columbia, 670 F.3d 1244, 1253 (D.C.Cir.2011) (“Heller II”); United States v. Rene E., 583 F.3d 8, 12 (1st Cir.2009). Traditionally, these regulations limited the carriage of weapons in sensitive locations such as courthouses or banned dueling or carrying concealed weapons such as pocket pistols or bowie knives. See Robert Leider, Our NonOriginalist Right to Bear Arms, 89 Ind. L.J. 1587, 1601 (2014). In contrast, those regulations prohibiting ownership of weapons outright focused on the status of the regulated party as a felon or a person ill-suited for gun ownership due to mental infirmities. Id. In short, outside of weapons deemed dangerous or unusual, there is no historical tradition supporting wholesale prohibitions of entire classes of weapons.

Standards of Scrutiny

Insofar as Highland Park’s ordinance implicates Friedman’s right to keep assault rifles and large-capacity magazines in his home for the purposes of self-defense, it implicates a fundamental right and is subject to strict scrutiny. See Clark v. Jeter, 486 U.S. 456, 461, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988) (“classifications affecting fundamental rights are given the most exacting scrutiny”) (citation omitted). Of course, other courts have applied lower standards of review even in cases where they recognized that the regulation impinged upon a fundamental right under the Second Amendment. See, e.g., Heller II, 670 F.3d at 1256.
The distinction here is a matter of kind and not degree; rather than limiting the terms under which a fundamental right might be exercised, Highland Park’s ordinance serves as a total prohibition of a class of weapons that Friedman used to defend his home and family. The right to self-defense is largely meaningless if it does not include the right to choose the most effective means of defending oneself. For this reason, Heller struck down a District of Columbia ordinance requiring that firearms in the home be rendered and kept inoperable at all times because the ordinance “makes it impossible for citizens to use [the regulated weapons] for the core lawful purpose of self-defense.... ” Heller, 554 U.S. at 630, 128 S.Ct. 2783. Because Highland Park’s ordinance cuts right to the heart of the Second Amendment, it deserves the highest level of scrutiny.
Under strict scrutiny, Highland Park must prove that its law furthers a compelling government interest and must employ the least restrictive means to achieve that end. United States v. Playboy Entertainment Group, Inc., 529 U.S. 803, 813, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000). Accordingly, Highland Park claims that the law furthers the compelling interest of pre *419 venting public shootings such as those witnessed at the movie theater in Aurora, Colorado and at Sandy Hook Elementary School in Connecticut. No problem so far: public safety is an obvious compelling interest in this case. That the regulated weapons are capable of inflicting substantial force is no doubt relevant in forming a basis for the City to regulate their use within its public spaces.
The difficulties arise in the next prong; rather than being the least restrictive means to address these particular public safety issues, Highland Park’s ordinance serves as the bluntest of instruments, banning a class of weapons outright, and restricting the rights of its citizens to select the means by which they defend their homes and families. Here, one need not parse out the various alternatives that Highland Park could have chosen to achieve these ends; any alternative would have been less restrictive. This can only yield one conclusion: the provisions in Highland Park’s ordinance prohibiting its citizens from acquiring or possessing assault rifles or large-capacity magazines are unconstitutional insofar as they prohibit citizens from lawfully keeping such weapons in their homes.
Insofar as Highland Park’s ordinance implicates the right to carry or use these weapons outside of one’s property, it is subject to intermediate scrutiny. To satisfy this standard, Highland Park must show that the restrictions are “substantially related to an important government objective.” Clark, 486 U.S. at 461, 108 S.Ct. 1910. As noted earlier, restricting the use and carriage of assault rifles and large-capacity magazines in Highland Park is related to an important government objective — protecting the safety of its citizens. Unlike strict scrutiny analysis, intermediate scrutiny does not require that the ordinance be the least restrictive means, but that it serve an important government interest in a way that is substantially related to that interest. Univ. of N.Y. v. Fox, 492 U.S. 469, 477, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989).
As other courts have noted, restrictions against assault weapons and large capacity magazines can survive intermediate scrutiny. Heller II, 670 F.3d at 1244. Here, Highland Park has a legitimate interest in ensuring the safety of its citizens in schools and other public places. For this reason, there is no problem concluding that the ordinance, insofar as it regulates the possession and use of the weapons in public places, coheres with the Second Amendment.
Several other matters require attention as well..
The rights in the Second Amendment: The court treats these rights as unitary and undifferentiated. In so doing, it makes no distinction between the right to keep arms to defend one’s home and the right to use those arms in a constitutionally permissible manner. But the Supreme Court has established clear parameters: the right to keep arms in the home for self-defense obtains the broadest protection, McDonald, 561 U.S. at 767, 130 S.Ct. 3020 (noting that the “need for defense of self, family, and property is most acute in the home ...”), while other rights under the Second Amendment are “not unlimited” but are subject to appropriate regulation. Here, the court makes no attempt to parse out the. various activities prohibited by Highland Park’s ordinance; instead it treats as identical activities as diverse as keeping weapons in the home and manufacturing them for sale. Heller requires courts to identify the specific activity regulated; the court here failed to do this.
The effect of longstanding regulations: It is important to note that Heller, for good reasons, did not seek to dismantle in *420 whole the nexus of existing firearms regulations. Instead, it sought to recast the focus of courts away from policy considerations and towards the original meaning of the Second Amendment. In so doing, it left intact existing regulations and stated that longstanding ones are accorded a presumption of constitutionality. Heller, 554 U.S. at 626-27, 128 S.Ct. 2783.
But a presumption is a very different thing from an assertion: we presume that laws are constitutional until and unless the regulation is challenged and a competent court informs us otherwise. In other words, it is a very different thing to presume a statute to be constitutional than to positively assert that it is. Here the court outlines various longstanding regulations and then proceeds to use them as a navigational chart to determine the confines of permissible firearm regulation. All of this culminates in a syllogism that runs, roughly speaking, as follows: machine guns have been illegal under law; assault weapons are similar to machine guns; therefore, assault rifles may be prohibited under law. Nothing in Heller or McDonald, supports this as an appropriate framework.
The evidentiary record: The court ignores the central piece of evidence in this case: that millions of Americans own and use AR-type rifles lawfully. (A. 65-73). Instead, it adopts — as the final word on the matter and with no discussion' — Highland Park’s position that the evidence is inconclusive on this question; and it does this notwithstanding the fact that all of the relevant evidence supports defendant’s contention that AR-type rifles are commonly used throughout this nation. Additionally, it posits as self-evident a comparison between semiautomatic weapons and machine guns despite the fact that the existing science is, at best, contested on this. More significantly, the only relevant evidence in record disputes this contention.[6]
The post-Heller framework: The court wholly disregards the (albeit still nascent) post-Heller framework established in this and our sister courts in favor of its own, unique path. In so doing, it offers a methodology in direct conflict to that offered by this circuit in previous cases, see, e.g., Ezell, 651 F.3d 684, and out of step with other circuits, United States v. Marzzarella, 614 F.3d 85 (3d Cir.2010); Heller II, 670 F.3d 1244.
Judicial findings: Finally, the court justifies the ordinance as valid because it “may increase the public’s sense of safety.” Perhaps so, but there is no evidentiary basis for this finding. The court is not empowered to uphold a regulation as constitutional based solely on its ability to divine public sentiment about the matter.
As noted earlier, the post -Heller framework is very much a work in progress and will continue to be refined in subsequent litigation. Neither Heller nor McDonald purported to resolve every matter involving the regulation of weapons; but they are clear about one thing: the right to keep arms in the home for self-defense is central to the Second Amendment and is not conditioned on any association with a militia. Instead of following this clear principle, the court engages in a gerrymandered reading of those cases to hold directly contrary to their precedents. In so doing, it upholds an ordinance that violates the Second Amendment rights of its *421 citizens to keep arms in their homes for the purpose of defending themselves, their families, and their property.
I respectfully dissent.

. This question'is best viewed as a separate, threshold matter than, as an aspect of the regulated activity. An example bears this out: because hand' grenades have never been commonly used by law-abiding citizens for lawful purposes, it matters not whether the regulation is an ordinance prohibiting ownership of such weapons, a licensing .scheme impeding access to them, or a regulation setting conditions on their manufacture or sale: the Second Amendment does not apply to such inquiry because the type of weapon is not covered by it.

. It is of no significance that other courts have worded this inquiry differently, asking whether the regulated weapons are "dangerous and unusual.” All weapons are presumably dangerous. To say that a weapon is unusual is to say that it is not commonly used for lawful purposes.

. Insofar as the evidentiary record addresses the matter, it supports the proposition that AR-rifles are commonly used by law-abiding citizens. Out of 57 million firearm owners in the United States, it is estimated that 5 million own AR-type rifles. (A. 66). Firearm industry analysts estimate that 5,128,000 AR-type rifles were produced in the United States for domestic sale, while an additional 3,415,-000 were imported. (A. 65; 73). Between 2008 and 2012, approximately 11.4% of firearms manufactured in the United States were AR-type rifles. A survey of randomly selected *416 United States residents demonstrated that an estimated 11,976,702 million persons participated in target shooting with an AR-type rifle in 2012. (A. 68; 102). The evidentiary record contains no entries disputing these estimates.

. Weapons can be commonly used by both criminals and law-abiding citizens. For example, the court correctly notes that handguns have long been the preferred weapon for criminals and are "responsible for the vast majority of gun violence in the United States...." Ante at 409. This, of course, is the same type of weapon that McDonald recognized as covered under the Second Amendment because it was (and still is) “the most preferred firearm in the nation.” 561 U.S. at 767, 130 S.Ct. 3020. In evaluating common use, McDonald considered as relevant only use by law-abiding citizens.

. Circularity results from the obvious fact that common use is aided when a weapon is legal and precluded when it is not. The argument goes that authorities are free to regulate irrespective of the Second Amendment until a weapon obtains a certain quotient of use by law-abiding citizens. After that, they are too late as Second Amendment protections obtain. Under this view, common use is the effect of law rather than the cause. But this scenario overstates the evolution of technology among weapons. Overwhelmingly, newly developed weapons are merely updated versions of weapons already in the marketplace. It is rare to have a weapon come to market in such form that it has no precursors subject to regulation. Weapon manufacturers are unlikely to expend funds to develop and bring to market variations on classes of weapons that are currently prohibited.

. Plaintiffs submitted a video demonstration highlighting some of the differences between semiautomatic, AR-type rifles and automatic rifles. (A. 63). Automatic weapons are selective-fire weapons where a single pull of the trigger will fire continuously until all ammunition is exhausted. (A. 21) In contrast, a semiautomatic weapon only allows for one round per pull. (A. 19).