OPINION OF THE COURT
Gabriel W. Gorenstein, J.
The defendant, a company that is alleged to operate vehicles used solely for the purpose of displaying commercial advertising, challenges the constitutionality of the New York City traffic rule that bars vehicles from using City streets for this purpose. The defendant is charged with three separate violations of section 4-12 (j) (1) of the New York City Traffic Rules and Regulations (codified at 34 RCNY 4-12 [j] [1]). In each incident, the defendant was issued a summons returnable in the Criminal Court for operating a vehicle in midtown Manhattan solely for the purpose of displaying a commercial advertisement. One of the summonses alleges that an individual was operating the defendant’s Isuzu “flat” truck on November 9, 1999, at 8:30 a.m. at 8th Avenue and West 41st Street, and that the truck “had an advertisement for ‘Jeweler on Fifth’ displayed on both sides. The vehicle had no cargo space. It’s [sz'c] sole function is to advertise this merchant.” Another vehicle is alleged to have advertised “Plan B Communications” while being operated at Broadway and 36th Street. The third summons alleges the vehicle was at Broadway and 44th Street bearing an advertisement for a company that was not the defendant’s. The violation of a City traffic rule is a traffic infraction, (See, Vehicle and Traffic Law § 1800 [a]; 34 RCNY 4-02 [d] [1].) Defendant has filed a motion to dismiss the summonses pursuant to CPL 170.30 (1) (a) and 170.35 (1) (c), arguing that the traffic rule violates the First Amendment of the United States Constitution as an impermissible restriction on commercial speech. Defendant’s motion has been opposed both by the People, represented by the Office of the District Attorney for the County of New York, and by the City of New York, represented by the Corporation Counsel, who has submitted a brief amicus curiae. For the following reasons, the defendant’s motion to dismiss is denied.
History of the Rule
The original Ordinance upon which the current rule is based was enacted on June 6, 1882. The relevant portion of the proceedings of the Board of Aldermen of the City of New York for that date states the following:
*905 “Alderman Roosevelt called up G.O. 303, being an ordinance, as follows:

“The Mayor, Aldermen and Commonalty of the City of New York do ordain as follows'.

“section 1. That no advertising trucks, vans or wagons shall be allowed in the streets of the City of New York, under a penalty of ten dollars for each offense.
“section 2. Nothing herein contained shall prevent the putting of business notices upon ordinary business wagons so long as such wagons are engaged in the usual business or regular work of the owner, and are not used merely or mainly for advertising.
“section 3. All ordinances and resolutions, or parts thereof, inconsistent or conflicting with the provisions of this ordinance are hereby repealed.
“section 4. This ordinance shall take effect on the first day of June, 1882.
“Alderman Levy moved to amend by striking out the word ‘June’ before the figures ‘1882,’ and inserting in lieu thereof the word ‘July.’
“The President put the question whether the Board would agree with said amendment.
“Which was decided in the affirmative.
“The President then put the question whether the Board would agree with said ordinance as amended.
“Which was decided in the affirmative.”
Sections 1 and 2 of the Ordinance were codified as sections 669 and 670 of the Revised Ordinances of 1897 as part of an article headed “Nuisances.” In the 1915 recodification of the New York City Ordinances, the ordinance was placed in a new chapter entitled “Traffic Regulations.” (Code of Ordinances of City of NY, ch 24, § 30 [adopted Mar. 23, 1915].) In 1936, the words “or motor vehicles” were added among other minor changes.
Section 435 of the newly enacted New York City Charter of 1936 gave the Police Commissioner the power to “make such rules and regulations for the conduct of pedestrian and vehicular traffic * * * as he may deem necessary.” Pursuant to this section, the Police Commissioner adopted a new set of Traffic Regulations on June 21, 1938, which consisted of an expanded version of the 1936 Code of Ordinances. The rule at issue here was listed as section 79 with minor changes under *906 the subheading “Equipment, Learner’s Streets; Soliciting; Street Car and Omnibus Stops; Etc.”
The rule was repromulgated in 1943 under a new subheading “Obstructions.” (Traffic Regulations, art 9, § 124 [Oct. 15, 1943].) The rule’s prohibition was rephrased to state: “No person shall operate, or cause to be operated, in or upon any street an advertising vehicle.” In 1954, the Commissioner of Traffic reworded the rule to forbid vehicles “for the purpose of advertising.” In 1964, City buses were exempted from the prohibitions.
The Department of Transportation’s Bureau of Traffic Operations published an amendment to the regulation in 1986. This amendment created a new exemption for “vehicles licensed by the New York City Taxi and Limousine Commission,” changed the rule’s prohibitions to cover operating a vehicle “for the purpose of commercial advertising,” and exempted vehicles in use for normal “business purposes.” It also changed the rule to require that advertisements placed on vehicles operated for normal business purposes must “relate [] to the business for which a vehicle is used.” The 1986 amendment was accompanied by an explanation that the changes were “to ensure the safety of the motoring public and to avoid the obstruction of traffic.” (City Record, June 30, 1986, at 1700.)
Following a recompilation of City rules in 1991, the regulation was included in title 34 (Transportation), chapter 4 (Traffic Rules and Regulations), § 4-13 (Miscellaneous). It was last amended in 1995 to grant Sanitation Department vehicles permission to carry advertisements. The current text of section 4-12 (j) of the New York City Traffic Rules and Regulations provides:
“(j) Commercial advertising vehicles. (1) Restrictions. No person shall operate, stand, or park a vehicle on any street or roadway for the purpose of commercial advertising. Advertising notices relating to the business for which a vehicle is used may be put upon a motor vehicle when such vehicle is in use for normal delivery or business purposes, and not merely or mainly for the purpose of commercial advertising, provided that no portion of any such notice shall be reflectorized, illuminated, or animated, and provided that no such notice shall be put upon the top of the vehicle and that no special body or other object shall be put upon vehicles for commercial advertising purposes. Advertisements may be put upon vehicles licensed by the New York City Taxi and Limousine Commission in accordance with the Commission’s rules.
*907 “(2) Buses and Sanitation Vehicles. Notwithstanding the foregoing provisions of this subdivision (j), buses operated pursuant to a franchise or consent from the Department of Transportation of the City of New York, and cleaning and collection vehicles owned or operated by the New York City Department of Sanitation may display commercial advertisements, including reflectorized and illuminated advertisements, on the exterior surface areas of such vehicles and may have installed on such vehicles the necessary frames, supports and related appurtenances in order to display such advertisements.” (34 RCNY 4-12 |j].)
Review of Restrictions on Commercial Speech
For many years, the Supreme Court adhered to the view that commercial advertising, the subject of the instant regulation, received no constitutional protection. (See, e.g., Valentine v Chrestensen, 316 US 52, 54 [1942] [“the Constitution imposes no (First Amendment) restraint on government as respects purely commercial advertising”]; accord, Pittsburgh Press Co. v Pittsburgh Commn. on Human Relations, 413 US 376, 384 [1973] [“commercial speech (is) unprotected by the First Amendment”], citing Valentine v Chrestensen.) It is undoubtedly for this reason that two prior challenges to progenitors of the very rule at issue in this case relied on other constitutional grounds. (See, Fifth Ave. Coach Co. v City of New York, 221 US 467 [1911] [Due Process, Equal Protection and Impairment of Contracts Clauses]; Railway Express Agency v New York, 336 US 106 [1949] [Due Process, Equal Protection and Interstate Commerce Clauses].) In both cases, the Supreme Court upheld the constitutionality of the traffic rule.
In 1976, the Supreme Court for the first time held that speech “propos[ing] a commercial transaction” is subject to some First Amendment protection. (Virginia State Bd. of Pharmacy v Virginia Citizens Consumer Council, 425 US 748, 762 [1976] [restriction on advertising price of prescription drugs].) Since Virginia State Bd., the Supreme Court has addressed the scope of protection afforded commercial speech in a variety of cases — nearly all of them involving attempts to single out certain commercial speech based on its content. (See, e.g., 44 Liquormart v Rhode Is., 517 US 484 [1996] [ban on advertisements stating the price of liquor]; Rubin v Coors Brewing Co., 514 US 476 [1995] [ban on advertisements containing alcoholic content of beer]; United States v Edge Broadcasting Co., 509 US 418 [1993] [restriction on lottery advertisements]; *908 Posadas de Puerto Rico Assocs. v Tourism Co., 478 US 328 [1986] [ban on in-State casino advertising].)
The Supreme Court has made clear that commercial speech is to be afforded less constitutional protection than noncommercial speech (see, e.g., United States v Edge Broadcasting Co., 509 US, supra, at 430 [referring to the “subordinate position of commercial speech in the scale of First Amendment values”]), and is subject to “ ‘modes of regulation that might be impermissible in the realm of noncommercial expression.’ ” (Board of Trustees v Fox, 492 US 469, 477 [1989], quoting Ohralik v Ohio State Bar Assn., 436 US 447, 456 [1978].) In Central Hudson Gas & Elec. Corp. v Public Serv. Commn. (447 US 557, 566 [1980]), the Court set out a four-part test for reviewing a regulation that impinges on commercial speech: “[1] [the speech] must concern lawful activity and not be misleading. [2] Next, we ask whether the asserted government interest is substantial. If both inquiries yield positive answers, [3] we must determine whether the regulation directly advances the governmental interest asserted, and [4] whether it is not more extensive than is necessary to serve that interest.” “The four parts of the Central Hudson test are not entirely discrete. All are important and, to a certain extent, interrelated.” (Greater New Orleans Broadcasting Assn. v United States, 527 US 173, 183 [1999].) The test still governs the review of restrictions on commercial speech. (See, supra, at 184.)
The first prong of the Central Hudson test is met in this case insofar as the rule does not purport to ban only advertising that concerns unlawful activity or is misleading. Thus, it is assumed that the defendant’s advertisements receive the limited constitutional protection afforded commercial speech and that the remainder of the Central Hudson test must be applied.
Assertion of “Substantial” Government Interest
Defendant’s central argument is that the traffic rule is unconstitutional because the Board of Aldermen in 1882 failed to include “legislative findings” that identify the substantial interest sought to be advanced by the restriction on commercial advertising. The defendant insists that contemporaneous evidence of legislative purpose is critical to any attempt to justify the traffic rule and that in its absence the rule must be struck down, regardless of the applicability of the Central Hudson factors. The defendant dwells at length upon the paucity of the debate in 1882 as reflected in the City Record and contrasts *909 the extensive debate garnered by other ordinances passed that same day 118 years ago. The defendant argues that the City may not supply a justification for the rule post hoc and that, because the aldermen failed to include a statement of purpose, the rule is unconstitutional.
The defendant’s argument enjoys no support from decisions of the Supreme Court. Nothing in Central Hudson (supra) or any of the other cases construing abridgements of commercial speech requires a governmental body to make any specific type of legislative findings or even to specify its purpose contemporaneously with the enactment of legislation that regulates commercial speech. All that the Supreme Court has required in applying the Central Hudson test is that the government “assert” a substantial interest to be achieved by the restriction (Central Hudson Gas & Elec. Corp. v Public Serv. Commn., 447 US, at 564).
In a case decided shortly after Central Hudson (supra), the Court rejected essentially the same argument the defendant makes here. In Bolger v Youngs Drug Prods. Corp. (463 US 60 [1983]), the Court considered a Federal statute that prohibited the mailing of unsolicited advertisements for contraceptives. In arguing that the Government’s interest in prohibiting such mailings was a substantial one under Central Hudson, the Government did not rely on the justifications for the statute that were offered during its passage in 1873. Instead, it “advance [d] interests that concededly were not asserted when the prohibition was enacted into law.” (463 US, at 71.) Rather than rejecting the post hoc rationalization for the restriction, the Court held that the Government’s reliance on newly advanced purposes was “permissible since the insufficiency of the original motivation does not diminish other interests that the restriction may now serve.” (Supra, at 71 [citing cases].) Since that time, it appears that in at least several instances the Court has relied on assertions made during the course of the litigation by the parties to supply the legislative purpose behind the enactment at issue. (See, e.g., Edenfield v Fane, 507 US 761 [1993] [statement of purpose contained in affidavits filed during the course of litigation]; Greater New Orleans Broadcasting Assn. v United States, 527 US, supra, at 185, 186, n 4 [Government briefs used to identify the governmental interest].) The absence of any requirement of legislative findings is hardly surprising given that the Supreme Court made no judicial inquiry into enactments restricting commercial speech until its Virginia State Bd. decision (supra) in 1976.
*910 The defendant’s argument is not entirely without basis, however. The United States Court of Appeals for the Second Circuit has on one occasion stated that to meet the second prong of the Central Hudson test, there must be some “statement of a substantial governmental interest” in the enactment itself or some “extrinsic” evidence offered that identifies the interest underlying the regulation. (National Adv. Co. v Town of Babylon, 900 F2d 551, 555 [2d Cir 1990], cert denied 498 US 852 [1990].) This court is reticent to find a special requirement based on this statement in National Adv., however, inasmuch as the Second Circuit, in a later case involving the application of this prong of the Central Hudson test, accepted a State agency’s assertions of “substantial” State interests that appeared nowhere in the enactment itself. (See, Bad Frog Brewery v New York State Liq. Auth., 134 F3d 87, 98 [2d Cir 1998], affg in relevant part 973 F Supp 280, 283-284 [ND NY 1997].) Instead, the Court affirmed without discussion the portion of the District Court’s opinion that held that “for purposes of a Central Hudson analysis, th[e] Court need not confine itself to only what is explicitly set forth as the legislative purpose of [the challenged enactment] in determining the validity of the Government interest asserted.” (973 F Supp, at 283 [emphasis added].)
Significantly, National Adv. (supra) had relied on Dills v City of Marietta, Ga. (674 F2d 1377, 1381 [11th Cir 1982], cert denied 461 US 905 [1983]), to support its conclusion that the enactment should contain contemporaneous evidence of purpose. Yet Dills' requirement of additional evidence of intent was based only on the citation to Supreme Court cases that arose in a completely different context: specifically, cases in which a party to the litigation had attempted to assert the existence of a legislative purpose that was unsupported by the Court’s own reading of the legislative enactment. (674 F2d, at 1381 [citing cases].) Here, by contrast, the City is not offering a justification for the enactment that in any way contravenes its obvious purpose of regulating the flow of traffic. For these reasons, and because Bolger (supra) forecloses the defendant’s argument, this court does not believe that there need be “extrinsic” evidence of legislative purpose or findings contained within the legislation itself. (Accord, Service Empls. Intl. Union v Fair Political Practices Commn., 747 F Supp 580, 584 [ED Cal 1990] [questioning National Adv.’s requirement of evidence of legislative purpose], affd 955 F2d 1312 [9th Cir 1992].)
*911 In any event, there is ample evidence of the purpose of the rule at issue beyond what has been argued by the parties in the course of briefing this motion. The rule itself is contained in the chapter of the City rules devoted to “traffic rules and regulations.” It formerly appeared in sections regarding “nuisances” and “obstruction” of traffic. The 1936 codification was undertaken pursuant to the regulatory power to “regulate, direct, control and restrict the movement of vehicular and pedestrian traffic.” (NY City Charter § 435 [adopted Nov. 3, 1936].) More recently, the 1986 amendment to the traffic regulations of the Department of Transportation’s former Bureau of Traffic Operations contained a statement of purpose, noting that the amendment was being proposed “to ensure the safety of the motoring public and to avoid the obstruction of traffic.” (City Record, June 30, 1986, at 1700.) Taken together, it cannot be doubted that the City’s purpose in enacting this rule was to promote traffic safety and alleviate traffic congestion. Thus, this is not even a situation where the City has proffered a post hoc rationalization that is at odds with the purpose of the framers, a circumstance approved by Bolger (supra). With respect to the present regulation, the Supreme Court has had no problem accepting the obvious purpose of the City’s ban on advertising vehicles. (See, Railway Express Agency v New York, 336 US 106, 109, supra [“We would be trespassing on one of the most intensely local and specialized of all municipal problems if we held that this regulation had no relation to the traffic problem of New York City. It is the judgment of the local authorities that it does have such a relation. And nothing has been advanced which shows that to be palpably false”].)[1]
*912 Having articulated the purpose of the rule — the regulation of traffic — this court concludes that the Government’s interest in this activity is “substantial.” The enactment of rules regarding traffic and which vehicles may lawfully use a valuable resource such as the public streets is a frequent subject of regulation by probably every State and municipal government. The New York Court of Appeals in considering this very traffic rule has noted that “[e]very procession, parade, or show upon vehicles passing through a public street tends to congestion therein, and to some extent interferes with those engaged in business or having their homes thereon * * * [Such advertising vehicles] would clearly tend to produce congestion upon the streets upon which they were driven or propelled.” (Fifth Ave. Coach Co. v City of New York, 194 NY 19, 30 [1909].) The added congestion of the City streets would concomitantly decrease safety. The City thus has a “substantial” interest in regulating this traffic. (See, Posadas de Puerto Rico Assocs. v Tourism Co., 478 US 328, 341, supra [Government’s interest in the “safety” of its citizens constitutes a substantial Government interest under Central Hudson, supra.)
Advancement of the Government’s Interest
The third Central Hudson factor is also met in this case. The regulation advances the Government’s interest in controlling traffic in that the ban on the use of advertising-only vehicles lessens the amount of potential traffic on the City streets. There is a direct correlation between the vehicles that are removed from the streets as a result of the ban and a decrease in traffic. There is nothing “speculative” or “tenuous” (Central Hudson Gas & Elec. Corp. v Public Serv. Commn., 447 US 557, 569, supra) about the ability of a regulation of this kind to reduce traffic. Nor does it matter that the defendant in this case may have at its disposal only a limited number of advertising vehicles. (See, United States v Edge Broadcasting Co., 509 US 418, 430-431, supra [validity of restriction must be judged based on its relation to the general problem sought to be addressed, “not by the extent to which it furthers the Government’s interest in an individual case”].) The very fact that this regulation has been challenged for nearly a hundred years by entities wishing to engage in commercial vehicle advertising suggests that there is no shortage of companies that would engage in advertising of this kind were it legal to do so. These companies would obviously have the greatest interest in advertising in areas of high traffic volume, as was alleged in *913 the present case, at times of day when the most vehicles and pedestrians would be seeking to use the City streets. This case thus stands in contrast with cases in which the Supreme Court has found no direct advancement of an asserted State interest because “the prohibitions * * * do not serve [the Government’s] purposes in a direct and material manner.” (Edenfield v Fane, 507 US 761, 773, supra.) Here it is obvious that the effect of the ban would be some reduction in traffic congestion. (See generally, Florida Bar v Went for It, 515 US, supra, at 628 [restriction on commercial speech may be justified by “ ‘simple common sense’”], quoting Burson v Freeman, 504 US 191, 211 [1992].)
The applicability of the third Central Hudson factor is buttressed by the decision of the Eleventh Circuit in Supersign of Boca Raton v City of Fort Lauderdale (766 F2d 1528 [11th Cir 1985]), a case almost identical factually to the instant matter.[2] In Supersign, the City of Fort Lauderdale had banned vehicles or watercraft “ ‘used for the primary purpose of displaying advertisements’ ” on any public roadway or waterway. (Supra, at 1529.) It granted an exception to vehicles displaying advertisements of the owner while the vehicle is engaged in the usual business of the owner. It also excepted advertisements on buses and taxicabs. The City proffered both traffic and aesthetic reasons as the justification for its ban.
In addressing the third prong of the Central Hudson test, Supersign (supra) noted that the City could have more completely advanced its purpose by banning all vehicular advertising, without the exceptions for business owners, taxis and buses. However, a municipality may “pursu[e] a partial solution to its problems.” (766 F2d, at 1531, citing Metromedia, Inc. v City of San Diego, 453 US 490, supra.) Supersign noted that “[b]y prohibiting the operation of some advertisement *914 vehicles, the City solves some of its traffic problem and reduces the total number of unsightly advertisements.” (Supra, at 1531.)
With respect to the exception granted to business owners to carry their own advertisements while being used for normal business purposes, this exception accords with the Supreme Court’s decision in Metromedia (supra), in which a majority of the Justices of the Court similarly approved a City ordinance that prohibited the placement of commercial billboards except in those locations where the advertised good was sold or manufactured at the location. (453 US, at 511.) As the Supreme Court observed in addressing the instant regulation: “The local authorities may well have concluded that those who advertised their own wares on their trucks do not present the same traffic problem in view of the nature or extent of the advertising which they use. It would take a degree of omniscience which we lack to say that such is not the case. If that judgment is correct, the advertising displays that are exempt have less incidence on traffic than those of [the proponents of advertising vehicles].” (Railway Express Agency v New York, 336 US 106, 110, supra.) Because the City’s rule directly and materially advances its interest in reducing traffic, the rule meets the third prong of the Central Hudson test.
Scope of Regulation
The fourth prong of the Central Hudson test asks whether the regulation is “more extensive than necessary” to serve the Government’s interest. The test requires “a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is ‘in proportion to the interest served,’ In re R. M. J., [455 US 191, 203 (1982)]; that employs not necessarily the least restrictive means but * * * a means narrowly tailored to achieve the desired objective. Within those bounds we leave it to governmental decisionmakers to judge what manner of regulation may best be employed.” (Board of Trustees v Fox, 492 US 469, 480, supra; accord, Greater New Orleans Broadcasting Assn. v United States, 527 US 173, 188, supra.)
While the defendant argues that the exceptions to the ban on commercial advertising show a lack of an appropriate fit between the rule and the City’s interest in reducing traffic congestion, the exceptions in fact demonstrate a remarkably close and appropriate tailoring of the advertising vehicle ban. The vehicles that are permitted to display advertising under the *915 rule are the very vehicles that can be expected to be using the public thoroughfares anyway for purposes unrelated to advertising. In other words, buses, taxis, sanitation trucks and commercial vehicles engaged in their ordinary business would be using the streets regardless of their ability to display commercial advertising.
These exceptions thus support the constitutionality of the traffic rule because a ban on advertising on these vehicles would not result in a reduction of traffic congestion. Moreover, these exceptions mean that businesses that wish their advertisements to be seen on City streets actually have a means available to accomplish this result, through the purchase of advertisements on buses, taxis or sanitation trucks. (Cf., Members of City Council v Taxpayers for Vincent, 466 US 789, 812 [1984] [City may ban placement of all posters on public property, including those containing noncommercial speech, where other avenues of expression are available].) Of course, stationary billboard space is available as well and, like vehicles bearing advertisements, is visible from public streets.
Here, the City has not instituted an unnecessarily broad rule that offers no potential for addressing the problem of traffic congestion. As was noted in Supersign, “each advertising vehicle * * * contributes to the problem.” (766 F2d, supra, at 1532.) The ban here is narrowly tailored to remove a class of vehicles from the street. The removal of these vehicles from the streets fulfills the City’s purpose of reducing the over-all number of vehicles congesting the City’s streets. This court will not second-guess the City’s decision to remove this narrow group even where it might have removed others. As is required by Fox, the fit between the legislative purpose and the categories of vehicles banned is “not necessarily perfect, but reasonable.” (492 US, supra, at 480.) Accordingly, the traffic rule does not violate the First Amendment. The motion to dismiss is denied.

. While the City relies solely on the traffic rationale, the People have offered both traffic congestion and aesthetics as justifications for the ban. Of course, an additional effect of the rule is to decrease the amount of air pollutants emitted, a circumstance that could not have been anticipated in 1882. Because the regulation is supportable based on the traffic congestion purpose alone, however, this court does not reach any other rationale. (See, Florida Bar v Went for It, 515 US 618, 624, n 1 [1995] [“a single substantial interest is sufficient to satisfy Central Hudson’s first prong”].)
The City has provided material as part of its amicus brief that gives additional evidence of the traffic problem that this regulation addresses — one that surely has only increased since 1882 with the rise in the City’s population and the invention of the automobile. While this court need not rely on the submitted material, it is noteworthy that the number of vehicles entering and leaving the island of Manhattan has increased 184% since 1948, to a present-day total of 1,900,300 on any given weekday. The average speed on midtown Manhattan avenues and streets is 6.75 miles per hour, compared with a legal speed limit of 30 miles per hour.

. While there are other cases that have voided restrictions on “portable signs,” these cases involve signs that are moved on a truck and then placed in a fixed position on private property for some number of days. (See, e.g., Dills v Cobb County, 755 F2d 1473 [11th Cir 1985]; Rhodes v Gwinnett County, 557 F Supp 30 [ND Ga 1982].) Thus, they are essentially equivalent to billboards. A majority of the Justices of the Supreme Court approved a complete ban on billboards displaying offsite commercial advertising in Metromedia, Inc. v City of San Diego (453 US 490 [1981]), while invalidating a ban on billboards displaying noncommercial advertising. Similarly, other cases have approved severe limitations on the placement of commercial portable signs under the Central Hudson test. (See, e.g., Don’s Porta Signs v City of Clearwater, 829 F2d 1051 [11th Cir 1987], cert denied 485 US 981 [1988]; Lindsay v City of San Antonio, 821 F2d 1103 [5th Cir 1987], cert denied 484 US 1010 [1988].)