Michael L. POTTS, D.D.S., and the American Academy of Implant Dentistry, Plaintiffs,

v.

Kathleen HAMILTON, Director, California Department of Consumer Affairs; Cynthia Gatlin, Executive Officer, California Dental Board; and Alan H. Kaye, D.D.S., President; Michael Pinkerton, Vice–President, Public Member; LA Donna Drury–Klein, R.D.A., Secretary; David I. Baron, Public Member; Newton Gordon, D.D.S., Member; Lawrence Hyndley, D.D.S., Member; Patricia Osuna, R.D.H., Member; George Soohoo, D.D.S., Member; Ariane Terlet, D.D.S., Member; and Chester Yokohama, D.D.S., Member, in their official capacities with the California Dental Board, Defendants.

No. CIV–S–03–0348DFL/DAD.

United States District Court, E.D. California.

Sept. 8, 2004.

Ann Taylor Schwing, Esq., McDonough Holland and Allen, Sacramento, Frank R. Recker, Esq. (Pro Hac Vice), Cynthia June Hubbard, Esq. (Pro Hac Vice), Marco Island, FL, for Plaintiffs.

Marcia A. Fay, Esq., Attorney General's Office for the State of California, Sacramento, CA, for Defendants.

Charles S. Painter, Esq., Ericksen Arbuthnot Brown Kildruff and Day, Sacramento, CA, Laurel A. Haskell, Esq., Steven P. Means, Esq., Michael Best and Friedrich, Chicago, IL, for Intervenors: Lawrence Addleson, DDS and American Academy of Cosmetic Dentistry.

*MEMORANDUM OF OPINION AND ORDER*

LEVI, District Judge.

This case is a further chapter in the long-running dispute between plaintiffs and the State of California over the State's prohibitions upon the advertising of dental specialty credentials. Plaintiffs challenge a recently enacted California statute restricting the advertising of dental specialty credentials to those credentials recognized by the American Dental Association ("ADA") or the Dental Board of California ("Dental Board"). The court previously found that an earlier version of this statute violated the protection afforded to commercial speech by the First Amendment. *See Bingham v. Hamilton,* 100 F.Supp.2d 1233 (E.D.Cal.2000). This renewed effort to limit the advertising of bona fide credentials fares no better. The advertising of credentials in dental specialties awarded by boards not recognized by the ADA or the Dental Board is not inherently or actually misleading. In addition, even if such advertising were potentially misleading, the statute is more restrictive than necessary to advance the State's interest in preventing false or misleading advertising of dental specialty credentials. Therefore, the statute violates the First Amendment, and plaintiffs are entitled to summary judgment.

I.

*A. The Parties*

Plaintiffs are Dr. Michael L. Potts, D.D.S. ("Potts") and the American Academy of Implant Dentistry ("AAID"). Potts is a California-licensed dentist in Camarillo and has been practicing general dentistry since 1975. He holds the credentials of "Fellow" from AAID and "Diplomate" from AAID's certifying board, the American Board of Oral Implantology/Implant

Dentistry ("ABOI/ID"), and he wants to advertise these credentials by listing them after his name. (Pls.' Mot. at 9.)

AAID is a national dental specialty organization which claims approximately 60 credentialed member dentists in California. (*Id.* at 2.) AAID sues in its own name and on behalf of its credentialed members in California. (*Id.*) AAID seeks to advance knowledge, skill, and expertise in the field of implant dentistry. To that end, AAID and ABOI/ID award various credentials to their members who fulfill certain educational, practice, and testing requirements. AAID awards the credentials of "Associate Fellow" and "Fellow," while ABOI/ID awards the higher credential of "Diplomate" (which is often advertised as "Board Certified"). (*Id.* at 1–2.) Besides completion of a dental degree, each of these credentials requires a certain number of years of practice in implant dentistry, completion of a substantial number of hours of continuing education in implant dentistry, completion of a multiple-choice written examination, and presentation of a certain number of cases exhibiting competence in performing various types of implants. (Exs. in Supp. of Pls.' Mot., Ex. B.) None of these credentials requires completion of a graduate or postgraduate education program in implant dentistry at a university-based dental school. (Pls.' Mot. at 9.)

Defendants are the Director of the California Department of Consumer Affairs and the Executive Officer, President, Vice-President, Secretary, and other members of the Dental Board of California. Defendants are charged with enforcing the statute at issue in this case and are sued solely in their official capacities. Plaintiffs seek a declaration that the statute is unconstitutional and an injunction against its enforcement.

*B. Background and Prior Litigation*

Any dentist with a general license to practice may perform implant dentistry in California.[1] There is no requirement of special training or education in implant dentistry. In addition, a general dentist may advertise that he limits his practice to implant dentistry. (*Id.* at 4–5.) While implant dentistry is an area of dental specialization in the broad sense, it is not a specialty recognized by the ADA or the Dental Board.[2] The current dispute centers around California's refusal to permit dentists to advertise their credentials earned from specialty boards (such as AAID and ABOI/ID) that are not recognized by the ADA or the Dental Board.

In *Bingham v. Hamilton,* 100 F.Supp.2d 1233 (E.D.Cal.2000) (*"Bingham II"*), the court held unconstitutional the enforcement policy of the Dental Board and a proposed regulation embodying that policy. At that time, the Dental Board's policy permitted a dentist to advertise a credential awarded by a specialty board only if that board was recognized by the ADA

---

1. "Implant dentistry consists of the placing of devices for attaching artificial replacement teeth to the same bones to which natural teeth are anchored.... According to the AAID, unlike most current forms of dentures, which sit on top of the gums or are attached to existing teeth, implants may be inserted into the bone, functioning like an artificial tooth root, or may be placed directly against the bone to support a dental prosthesis." *Bingham v. Hamilton,* 100 F.Supp.2d at 1234 n. 1 (citations and internal quotation marks omitted).

2. The ADA recognizes only nine areas of dental specialization and accredits boards to award credentials in each of these areas. These nine areas are: oral and maxillofacial surgery; prosthodontics; periodontology; oral and maxillofacial radiology; oral pathology; public health dentistry; endodontics; orthodontics and dentofacial orthopedics; and pediatric dentistry. (Pls.' Mot. at 3.)

or by the Dental Board. The policy set out three criteria on which a non-ADA-recognized specialty board must condition the granting of credentials in order to be recognized by the Dental Board: (1) "successful completion of a formal advanced education program at or affiliated with an accredited dental or medical school equivalent to at least one academic year beyond the predoctoral curriculum;" (2) "successful completion of an oral and written examination based on psychometric principles;" and (3) "training and experience subsequent to successful completion of [the education and testing requirements], to assure competent practice in the dental discipline as determined by the . . . board . . . which grants the credentials." *Id.* at 1236–1237. Dentists holding AAID credentials could not advertise these credentials because AAID did not then—and does not now—require successful completion of a formal advanced education program at an accredited dental school equivalent to at least one academic year beyond the D.D.S. degree.

The plaintiffs in *Bingham II* challenged the one year of postgraduate education requirement under the First Amendment. The court held that the advertising of AAID credentials was not inherently or actually misleading because AAID was a bona fide organization that issued credentials according to objectively verifiable standards. *Id.* at 1240. Further, while the State has a substantial interest in preventing the general public from being misled that AAID and ABOI/ID credentials are from a board recognized by the ADA or the Dental Board or that such credentials require successful completion of a postgraduate education program at an accredited dental school, this interest could be protected by a required disclaimer without a wholesale prohibition on the listing of the credential. *Id.* at 1240–1241.

## C. Business and Professions Code Section 651(h)(5)(A)

Some two years after the Dental Board's regulation and enforcement policy was invalidated in *Bingham II*, the California legislature enacted § 651(h)(5)(A) of the Business and Professions Code. (*Id.* at 5–7.) The legislative history of this provision shows that its sponsors intended to codify substantially the same advertising restrictions as those embodied by the proposed regulation and enforcement policy struck down in *Bingham II*. (*Id.; see also* Compl., Exs. D–J.) Section 651(h)(5)(A)(i) specifically addresses dental specialty advertising in specialties recognized by the ADA. For these ADA-recognized specialties, § 651(h)(5)(A)(i) forbids a dentist from holding himself out as a specialist or as being a member of or holding credentials from a certifying board unless that board is recognized by the ADA (or the dentist has completed a specialty education program approved by the ADA). (Defs.' Mot. at 6.) It is undisputed that the AAID and ABOI/ID do not fall into this category because implant dentistry is not an ADA-recognized specialty. (*Id.;* Pls.' Mot. at 8.)

Section 651(h)(5)(A)(ii) regulates specialty advertising by dentists in areas of dentistry that are not recognized as specialties by the ADA. (Defs.' Mot. at 6.) It allows a dentist specializing in one of these areas to advertise credentials awarded by a non-ADA-recognized specialty board (such as AAID and ABOI/ID) only if that board is recognized as a bona fide organization by the Dental Board. In order to be recognized as bona fide, a non-ADA-recognized specialty board must condition credentialing or membership on three requirements that are similar to the three requirements for non-ADA-recognized specialty boards contained in the regulation at issue in *Bingham II*. These three requirements are: (1) "successful completion of a formal,

full-time advanced education program that is affiliated with or sponsored by a university based dental school and is beyond the dental degree at a graduate or postgraduate level;" (2) "prior didactic training and clinical experience in the specific area of dentistry that is greater than that of other dentists;" and (3) "successful completion of oral and written examinations based on psychometric principles." Cal. Bus. & Prof.Code § 651(h)(5)(A)(ii)(I)-(III). It is undisputed that AAID and ABOI/ID do not condition membership or credentialing on successful completion of a formal, full-time advanced education program at a university-based dental school that is beyond the dental degree. (Defs.' Mot. at 6–7; Pls.' Mot. at 9.) As in *Bingham II*, plaintiffs challenge this educational requirement as unconstitutional because it completely prevents advertising of AAID and ABOI/ID credentials.

Defendants point out that even if a dentist is not allowed to advertise a specialty credential under § 651(h)(5)(A)(i) or (ii), he may still advertise a practice emphasis in any area of dentistry, as long as he indicates in the advertisement (in capital letters) that he is a general dentist. Cal. Bus. & Prof.Code § 651(h)(5)(A)(iii). In the context of this case, defendants have indicated that nothing in § 651(h)(5)(A) prohibits implant dentists like Potts from advertising that they limit their practices to implant dentistry or that they have completed a certain number of continuing education classes in implant dentistry. (Defs.' Mot. at 7.) Defendants also acknowledge that nothing in § 651(h)(5)(A)

prohibits AAID members from advertising that they are "members" of AAID. But Potts may not advertise that he is a "Fellow" of AAID and a "Diplomate" of (or "Board Certified" by) ABOI/ID. He may not indicate to the general public that he is a credentialed member of AAID and ABOI/ID. (*Id.* at 8.) In short, while Potts can advertise that he limits his practice to implant dentistry and has taken courses in implant dentistry, he cannot advertise that he has achieved a measure of expertise as determined by AAID and ABOI/ID.

## II.

### A. Res Judicata

Plaintiffs argue that defendants are precluded from contesting the constitutionality of § 651(h)(5)(A) because substantially the same advertising restrictions were held unconstitutional in *Bingham II* and defendants had a full opportunity in that action to defend the restrictions. (Pls.' Mot. at 17–19.)[3]

Defendants do not dispute that the parties in *Bingham II* and in this case are identical and that *Bingham II* was litigated to a final judgment on the merits. (Defs.' Opp'n at 5–6.) However, defendants contend that no identity of claims or issues exists between this case and *Bingham II*. (*Id.* at 6–8; Defs.' Reply at 3–6.) The court agrees. While the claims and factual circumstances are quite similar, they are not the same. The educational requirement in § 651(h)(5)(A)(ii)(I) insists upon "successful completion of a formal,

---

3. Claim preclusion bars relitigation of claims that were raised or could have been raised in a prior lawsuit. It requires an identity of claims, a final judgment on the merits in the prior lawsuit, and identity of, or privity between, the parties in the first and second lawsuits. *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 713 (9th Cir.2001). Issue preclusion bars relitigation of issues ac-

tually litigated and decided in a prior lawsuit. It requires an identity of issues, a final judgment on the merits in the prior lawsuit, a full and fair opportunity to litigate the issue in the prior proceeding, actual litigation and decision of the issue in the prior proceeding, and the necessity of that issue to support a final judgment on the merits in the prior proceeding.

full-time advanced education program that is affiliated with or sponsored by a university based dental school and is beyond the dental degree at a graduate or postgraduate level." By contrast, the regulatory educational requirement in *Bingham II* entailed "successful completion of a formal advanced education program at or affiliated with an accredited dental or medical school equivalent to at least one academic year beyond the predoctoral curriculum." *Bingham II,* 100 F.Supp.2d at 1236. Moreover, in *Bingham II* there was no dispute by defendants that AAID and ABOI/ID were bona fide organizations who issued bona fide, not sham, credentials. Now that the State legislature has acted to reinvigorate the regulation, defendants contend, and the statute provides, that any organization and credential that does not meet the statutory requirements cannot be bona fide and must be misleading to the public. Finally, the court has discretion to relax application of preclusion where the defendant is a government entity, particularly a political sovereign. For all of these reasons, the court declines to find that defendants are barred by *Bingham II* from defending § 651(h)(5)(A).

### B. Commercial Speech

Dr. Potts wants to tell prospective and existing patients that he has certain credentials by, for example, displaying a certificate in his office or including the credentials after his name on a business card or telephone book listing. This is a classic form of commercial speech and, unless misleading, would not be subject to prohibition under well-established principles. Where the different professions are concerned, however, the analysis becomes somewhat more complex. Professionals who lack the claimed credential consider that those who would advertise it seek an unfair competitive advantage based on the false premise that the credential equates to a higher level of skill. Moreover, state-

approved accrediting organizations believe that they bring expertise and knowledge of the profession and its art to the table, and see their advertising regulations as part of their overall regulation of the profession through the establishment of meaningful standards. Those organizations that are not state-sanctioned see this kind of regulation as protectionist of certain interests and professional groups.

A state may absolutely prohibit commercial speech that is false, deceptive, or misleading. *Va. State Bd. Of Pharmacy v. Va. Citizens Consumer Council, Inc.,* 425 U.S. 748, 771–772, 96 S.Ct. 1817, 1830–1831, 48 L.Ed.2d 346 (1976). Where the speech is not deceptive, the state may restrict it "only if the [s]tate shows that the restriction directly and materially advances a substantial state interest in a manner no more extensive than necessary to serve that interest." *Ibanez v. Fla. Dep't of Bus. & Prof'l Regulation, Bd. of Accountancy,* 512 U.S. 136, 142, 114 S.Ct. 2084, 2088, 129 L.Ed.2d 118 (1994) (citing *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n,* 447 U.S. 557, 566, 100 S.Ct. 2343, 2351, 65 L.Ed.2d 341 (1980)).

■ Thus, if an advertisement is inherently misleading or has in actual practice misled members of the consuming public, it is not protected by the First Amendment and may be absolutely prohibited. The state need not demonstrate that a statute banning such inherently or actually misleading speech directly and materially advances a substantial interest or exhibits the reasonable means-end fit required under the *Central Hudson* test. However, if an advertisement is merely potentially misleading, in that the information could be presented in a different way that would not potentially mislead, then it is protected by the First Amendment and may not be absolutely prohibited. As to potentially misleading advertisements, the

state may insist upon a presentation—typically the inclusion of additional clarifying information such as a disclaimer—that removes the potential for deception, so long as the regulation is no more extensive than necessary to directly and materially advance the state's interest. *See In re R.M.J.*, 455 U.S. 191, 203, 102 S.Ct. 929, 937–938, 71 L.Ed.2d 64 (1982); *Am. Acad. of Pain Mgmt. v. Joseph*, 353 F.3d 1099, 1106–1107 (9th Cir.2004).

 As to the advertising of professional credentials, the Supreme Court has stated that credentials issued by bona fide credentialing organizations, whose standards are rigorous, objectively clear, and verifiable, cannot be inherently or actually misleading because they are statements of objective, verifiable fact, rather than statements of opinion or about quality.[4] *Peel v. Attorney Registration & Disciplinary Comm'n*, 496 U.S. 91, 101–102, 110 S.Ct. 2281, 2288, 110 L.Ed.2d 83 (1990). However, advertising of such credentials could still potentially be misleading, requiring application of the *Central Hudson* test to any regulation of such advertising. Moreover, mere speculation about the possibility of deception in hypothetical cases does not suffice to show that an advertisement is inherently or even potentially misleading. The state must provide evidence to show that there is a real potential that a particular advertisement or credential will mislead the public in some way. *Ibanez*, 512 U.S. at 145, 146–147, 114 S.Ct. at 2090–2091. The Court has also cautioned that the determination of whether an advertisement or credential is inherently or potentially misleading is necessarily fact-intensive and case-specific. *Id.* at 146, 114 S.Ct. at 2090.

## C. AAID and ABOI/ID Credentials: Inherently Misleading?

Defendants do not contend that any member of the public has actually been misled by AAID or ABOI/ID credentials. Rather, defendants primarily claim that the credentials are inherently misleading, justifying a total ban. Defendants rely heavily on the Ninth Circuit's recent opinion in *American Academy of Pain Management v. Joseph*, 353 F.3d 1099 (9th Cir.2004) (*"Pain Management"*). In *Pain Management*, the Ninth Circuit upheld Business and Professions Code § 651(h)(5)(B), an analogous California statute regulating advertising of medical specialty credentials, against a First Amendment challenge brought by credentialed members of the American Academy of Pain Management ("AAPM"). Section 651(h)(5)(B) forbids California-licensed physicians from advertising that they are certified or eligible for certification by a medical specialty board unless that board is either recognized by the American Board of Medical Specialties ("ABMS") or approved by the Medical Board of California ("Medical Board") as having requirements for certification that are equivalent to those of ABMS-recognized medical specialty boards. *See id.* at 1104. However, the California Attorney General in *Pain Management* clarified that § 651(h)(5)(B) restricts only use of the term "board certified" and its equivalents. Therefore, unlike § 651(h)(5)(A), it does not restrict advertisement of credentials, such as "diplomate" or "fellow," issued by non-recognized medical specialty boards. *Id.* at 1104, 1111.

The *Pain Management* court held that an advertisement using the term "board certified" to denote a credential from a

---

4. By contrast, the Court noted that advertising of credentials "issued by an organization that had made no inquiry into [an applicant's] fitness, or by one that issued certificates indiscriminately for a price," could be inherently or actually misleading. *Peel*, 496 U.S. at 102, 110 S.Ct. at 2288. This is not the circumstance presented here.

non-ABMS-recognized medical specialty board is inherently misleading. *Id.* at 1107–1108. It observed that the term "board certified" is a term of art that has acquired and long held a precise meaning within the medical profession. Within that context, the term "board certified" means only that a doctor has been certified by a board that is a member of ABMS in one of the 23 areas of medical specialization recognized by ABMS. *Id.* at 1104–1105. "Board certified" also conveys that the doctor has achieved "a high level of specialized skill and proficiency." *Id.* at 1105. Since the California legislature defined the term "board certified" in accordance with this meaning in § 651(h)(5)(B), the Ninth Circuit held that an advertisement containing a statement that a doctor is "board certified" by a board not recognized by ABMS would be inherently misleading. *Id.* at 1108.

Defendants argue that just like § 651(h)(5)(B) in *Pain Management*, § 651(h)(5)(A) gives a "special and particular meaning to the advertising of postgraduate accreditations awarded in specific areas of dentistry." (Defs.' Mot. at 10.) Thus, according to defendants, any advertisement of credentials that does not conform to that meaning is inherently misleading. However, this argument does not adequately account for the differences between the statute and factual circumstances in *Pain Management* and the statute and factual circumstances in this case.

The statute in *Pain Management* has a far narrower regulatory scope than the statute in this case. Section 651(h)(5)(B) restricts only use of the specific term "board certified" and its equivalents, such as "certified by a board," "board eligible,"

and "eligible for board certification." *Pain Management*, 353 F.3d at 1104–1105 n. 3, 1111. By contrast, § 651(h)(5)(A) restricts advertisement of all credentials awarded by dental specialty boards, including terms like "fellow," "diplomate," and the like. The court in *Pain Management* addressed only whether use of the specific term "board certified" was inherently misleading in the context of that case—in particular, the unique, long established meaning of the term "board certified"; it did not hold that any advertisement of professional credentials not authorized by statute would be, for that reason alone, inherently misleading. Such an expansive view of *Pain Management* would place it in conflict with Supreme Court precedents such as *Peel* and *Ibanez* and effectively would remove all First Amendment protection from this area by permitting state legislatures to declare that all deviations from legislatively sanctioned terms and standards were inherently misleading and, therefore, subject to outright prohibition.

The *Pain Management* court relied on a particular record demonstrating that the term "board certified" had acquired a fixed, technical meaning within the medical profession, and that the California legislature had simply codified that meaning in § 651(h)(5)(B). *Id.* at 1104–1105 (quoting *Peel*, 496 U.S. at 102 n. 11, 110 S.Ct. at 2288 n. 11). By contrast, defendants in this case have provided scant evidence that all dental specialty credentials, or even terms such as "diplomate" or "specialist," have similarly acquired a fixed, technical meaning within the dental profession. (*See* Defs.' Mot. at 3; Neumann Decl. ¶¶ 5, 11; McGinley Decl. ¶ 4.)[5] The statute in

---

5. Defendants provide two declarations to support their position that credentials like "diplomate" have acquired a fixed, technical meaning within the dental profession. The Neumann Declaration simply asserts that the terms "diplomate" and "board certified"

have historically been used to denote someone who has completed all the requirements of an ADA-recognized specialty certifying board. (Neumann Decl. ¶ 11.) Such conclusory statements cannot substitute for evidence

*Pain Management* explicitly defined the term "board certified" to accord with its historical meaning within the medical profession. *See* Cal. Bus. & Prof.Code § 651(h)(5)(B). There is no equivalent definition for "board certified," "diplomate," "fellow," or any other type of credential to be found in § 651(h)(5)(A). Nor is there evidence of a well-established, specialized meaning accorded to all dental specialty credentials in the same way that the term "board certified" has become a term of art within the medical profession.

Finally, unlike the American Academy of Pain Management, AAID and ABOI/ID are bona fide credentialing organizations whose standards are rigorous, objectively clear, and verifiable.[6] In addition to attainment of a dental degree, each credential issued by AAID and ABOI/ID requires a certain number of years of practice in implant dentistry, completion of a substantial number of hours of continuing education in implant dentistry, completion of a written examination, and presentation of a certain number of cases demonstrating proficiency in performing various types of dental implants. (Exs. in Supp. of Pls.' Mot., Ex. B.) By contrast, anyone with two years experience working with patients experiencing pain who successfully completed a two-hour, 100–question multiple choice examination could become a "board certified" member of AAPM. *Pain Management*, 353 F.3d at 1103. Moreover, there was evidence indicating that more than eighty percent of AAPM's members had not taken that examination, but rather had been grandfathered in. *Id.* The factual circumstances of *Pain Management* come very close to *Peel*'s definition of a sham organization, since AAPM apparent-

6. Defendants argue that the requirements for these credentials have changed since the decision in *Bingham II*, and that they cannot therefore be considered objectively clear or verifiable, as those terms were used in *Peel*. (Defs.' Mot. at 11–14.) Defendants have presented some evidence that the methods of qualifying for the credentials have been altered and that some of the substantive requirements have changed in minor ways. (*See generally* Shuck Dep., Fay Decl., Ex. 1; Potts Dep., Fay Decl., Ex. 2.) None of this evidence indicates that the prerequisites for AAID and ABOI/ID credentials are not objectively clear and verifiable. They are readily accessible on the websites of AAID and ABOI/ID, and they are not susceptible to subjective manipulation. *See* http:// establishing such a historical meaning for all dental specialty credentials. The McGinley Declaration states that the dental insurance industry in California understands the term "board certified" to designate someone who has completed the requirements for certification in an ADA-recognized dental specialty. (McGinley Decl. ¶ 4.) This declaration addresses only use of the term "board certified" and therefore says nothing about the meaning of *other* dental specialty credentials, such as "diplomate."

www.aaid-implant.cnch ost.com/memberservices/credentials/AFExamRequirements.pdf (last visited August 23, 2004) (Associate Fellow requirements); http://www.aaid-implant.cnchost.com/mem berservices/credentials/FExamRequirements.pdf (last visited August 23, 2004) (Fellow requirements); http://www.aboi.org/requirem.htm (last visited August 23, 2004) (Diplomate requirements). Furthermore, even where a credentialed AAID member has attained "Fellow" or "Diplomate" status under an older method of qualification, there is no evidence in the record to suggest that the previous requirements are substantively different or less rigorous than the current requirements. Defendants' position strongly implies that any credentialing organization whose requirements have changed in any way would not be bona fide as contemplated by the *Peel* Court. Such a proposition is altogether too broad, as it would in all likelihood exclude most credentials from the protections of the First Amendment on the ground that they are inherently misleading. In sum, nothing defendants have presented detracts from the conclusion that AAID and ABOI/ID are bona fide credentialing organizations whose requirements are rigorous, objectively clear, and verifiable. *See Peel*, 496 U.S. at 101–102, 110 S.Ct. at 2288.

ly made little inquiry into applicants' fitness and conferred membership on applicants almost indiscriminately. AAID and ABOI/ID are in a very different position, awarding their credentials only to applicants who have fulfilled rigorous criteria that are objectively clear and verifiable. Since these credentials are representations of objectively verifiable facts, rather than statements of opinion or quality, such credentials cannot be considered inherently misleading. *Peel*, 496 U.S. at 101–102, 110 S.Ct. at 2288.

█ In light of the differences between the statute and factual circumstances in *Pain Management* and the statute and factual circumstances in this case, and *Peel's* favorable treatment of credentials like those issued by AAID and ABOI/ID, the credentials issued by AAID and ABOI/ID cannot be considered inherently misleading. It follows that § 651(h)(5)(A) cannot be sustained on the ground that it regulates only inherently misleading speech.

### D. AAID and ABOI/ID Credentials: Potentially Misleading?

█ In *Ibanez*, the Supreme Court held that defendants seeking to uphold the validity of a commercial speech regulation must provide concrete evidence to show that there is at least a real potential that a particular advertisement will mislead the public in a particular way. *Ibanez*, 512 U.S. at 145, 146–147, 114 S.Ct. at 2090–2091. Mere speculation as to the potential for deception in hypothetical cases does not suffice. *Id.* In *Bingham II*, the defendants presented only "conclusory, anecdotal, and speculative" evidence to show that

AAID and ABOI/ID credentials carried with them a potential to mislead the public. *Bingham II*, 100 F.Supp.2d at 1240. The court held that by failing to produce any empirical evidence, defendants had failed to carry their burden under *Ibanez. Id.*

In this case, defendants provide two surveys to show that AAID and ABOI/ID credentials are potentially misleading. One survey ("the Cogan mall survey") was conducted at malls in various parts of California and surveyed 200 people. (Cogan Decl., Report, pp. 10–11, 13.) Respondents were shown one of four different mock-ups of a fictitious advertisement for a dentist who is a Fellow of AAID and a Diplomate of ABOI/ID (also tested as Board Certified by ABOI/ID). (*Id.*, pp. 12–13.) Two of these mock-ups contained the AAID and ABOI/ID credentials without a disclaimer, and two featured the credentials with a disclaimer.[7] (*Id.*, p. 12.) The Cogan mall survey purports to demonstrate that most members of the public mistakenly believe (1) that completion of a full-time postgraduate education program beyond the D.D.S. degree is required to earn these credentials and (2) that AAID and ABOI/ID are recognized by the ADA and the Dental Board. (*Id.*, pp. 14–26.)

The other survey ("the Kamins phone survey") was conducted by telephone and also surveyed 200 people. (Kamins Decl., Ex. 3, pp. 2–3.) Respondents were asked questions about whether they thought that AAID and ABOI/ID credentials indicate that the holder is a specialist in implant dentistry, whether a specialist in implant dentistry must complete "some form of full-time training within an accredited den-

---

7. One of the two mock-ups containing the credentials "Diplomate of [ABOI/ID]" and "Fellow of [AAID]" included a disclaimer stating that "[t]he Diplomate and Fellow designations are awarded on the achievement of certain qualifications which can be found at www.aboi.org." (Cogan Decl., Display, Ad

# 1B.) One of the two mock-ups containing the credential "Board Certified by [ABOI/ID]" included a disclaimer stating that "The [ABOI/ID] is not an accrediting organization that is recognized by the [ADA] or the [Dental Board]." (*Id.*, Ad # 2B.)

tal school affiliated with a university," and whether AAID and ABOI/ID credentials imply that implant dentistry is a dental specialty recognized by the ADA. (*Id.*, pp. 3–5.) The Kamins phone survey resulted in high levels of affirmative responses to each of the preceding questions. (*Id.*)

These two surveys are of only limited value in determining whether AAID and ABOI/ID credentials are potentially misleading. Each suffers from serious deficiencies that render its significance open to question. The Cogan mall survey is not a probability sample, since respondents were not pre-selected in a random manner from across the general population. Because of the selection bias in the sampling procedure, no reliable extrapolation can be made from the results of this convenience sample to the general population of California. (*See* Stokes Decl., Report, p. 2.) More significantly, both the Cogan mall survey and the Kamins phone survey asked leading and compound questions of respondents. The leading questions tend to suggest their own answer and may well have guided respondents to a particular answer.[8] (*See id.*, p. 3.) The compound questions contain two or more elements, making it impossible to determine which element the respondent addressed in his or her response. (*See id.*) The Kamins phone survey in particular asked respondents questions that were quite long and convoluted, making it unlikely that most respondents remembered the beginning of the question once the interviewer reached the end of the question and requested a response.[9] (*See id.*)

Even if the results of these surveys were deemed reliable, many of the responses are not relevant to the question at hand. Most of the questions in each survey do not measure the percentage of the general public that believes that—without regard to AAID or ABOI/ID credentials—implant dentistry is a dental specialty recognized by the ADA or the Dental Board.[10]

8. For example, the Kamins phone survey asked the following leading questions: "Do you believe that the [ADA] recognizes implant dentistry as one of their nine sanctioned dental specialties?" "In your opinion, is part of the requirement to be considered a 'specialist in implant dentistry', the completion of some form of full-time training within an accredited dental school?" "Must this dental school be affiliated with a university?" (Kamins Decl., Ex. 3, 1st questionnaire, p. 3, questions 1, 4a, & 4b.) The Cogan mall survey asked the following leading questions: "Do you think that this dentist has or has not completed additional dental education beyond his general dental degree?" "Do you think that the [AAID] and the [ABOI/ID] are accrediting organizations recognized by the [ADA]?" "Do you think this dentist is a specialist in performing dental implants?" (Cogan Decl., Questionnaires & Instructions.)

9. For example, the Kamins phone survey asked the following question: "If a dentist promoted himself or herself as a 'fellow' of the American Academy of Implant Dentistry and has achieved the distinction of 'diplomate' of the American Board of Oral Im-

plantology through successful completion of experiential, educational and testing requirements, would you consider that dentist to be a 'specialist' in implant dentistry?" (Kamins Decl., Ex. 3, 1st questionnaire, p. 3, question 3.)

10. One question in the Kamins phone survey did seek to determine what percentage of the general public thinks that implant dentistry is an ADA-recognized specialty, without mention of AAID and ABOI/ID credentials, and therefore what effect the mention of AAID and ABOI/ID credentials has on that percentage. (*See* Kamins Decl., Ex. 3, pp. 4–5.) The results from this question seem to indicate that AAID and ABOI/ID credentials have relatively little effect on public perceptions about whether implant dentistry is an ADA-recognized dental specialty. Forty-three percent of respondents said that they thought implant dentistry is an ADA-recognized specialty without mention of AAID and ABOI/ID credentials, while 54.5% of respondents thought that implant dentistry is an ADA-recognized specialty once AAID and ABOI/ID credentials were mentioned. (*See id.*) This is an increase of only 11.5%, which provides little

The surveys also do not assess the background understanding of the general public regarding how much education a specialist in implant dentistry is required to complete. It is impossible to determine what, if any, misleading effect AAID and ABOI/ID credentials have, because there is no control set against which this effect can be measured.

Finally, although the Cogan mall survey tested the effect of various disclaimers on public perceptions regarding the educational requirements for and sponsorship of AAID and ABOI/ID credentials, these results are also of little help to defendants. First, the Cogan mall survey was conducted in a manner that renders its results far from reliable. Leaving aside the fact that it is not a scientific probability survey, it also tested mall shoppers who had been to a dentist in the past two years. (Cogan Decl., Report, p. 13.) It did not target people who had been to an implant dentist, who required the services of an implant dentist, or even who knew what implant dentistry is. This is the audience that could be expected to study implant dentistry advertisements with care, and rely upon them in choosing a dentist, whereas the average mall shopper who has merely seen a general dentist in the past two years might not be so careful.

More significantly, the disclaimers that were tested did reduce public misperceptions about the educational requirements for and sponsorship of AAID and ABOI/ID credentials. The website disclaimer reduced the number of people who thought that such credentials require completion of some education beyond a general dental degree from 68% to 52%, while the ADA non-recognition disclaimer reduced this number from 78% to 50%. (*Id.*, p. 16.) Furthermore, the ADA non-recognition

disclaimer reduced the number of people who thought that AAID and ABOI/ID credentials are recognized by the ADA and the Dental Board from 70% to 18%. (*Id.*, p. 20.) These numbers indicate that a carefully worded disclaimer can be quite effective at reducing the general public's confusion as to the educational requirements for and sponsorship of AAID and ABOI/ID credentials.

It is doubtful that these two surveys, standing alone, satisfy the standard articulated by the Supreme Court in *Ibanez*. However, it is not necessary to resolve this question. Assuming that these two surveys do meet the *Ibanez* threshold to demonstrate that AAID and ABOI/ID credentials are potentially misleading, § 651(h)(5)(A) can survive plaintiffs' challenge only if it satisfies the remaining three elements of the *Central Hudson* test. It does not.

*E. Is Section 651(h)(5)(A) More Extensive than Necessary to Directly and Materially Advance the State's Interest in Preventing Misleading Advertising of Professional Credentials?*

 Even assuming that AAID and ABOI/ID credentials are potentially misleading, the statute as applied to those credentials cannot withstand scrutiny under the remaining factors of the *Central Hudson* test because the regulation, in the form of a prohibition, is more extensive than necessary to advance the State's interest in preventing misleading advertising of professional credentials.

There is no dispute that § 651(h)(5)(A) serves a substantial state interest. The Supreme Court and the Ninth Circuit have long recognized that states have a substantial interest in regulating advertising by

support for the proposition that AAID and ABOI/ID credentials carry with them a real, concrete potential to mislead the public about

whether implant dentistry is an ADA-recognized specialty or whether AAID and ABOI/ID credentials are recognized by the ADA.

professionals to prevent deception of the general public. *In re R.M.J.*, 455 U.S. at 202, 102 S.Ct. at 937; *Pain Management*, 353 F.3d at 1108–1109. Defendants contend that California has a substantial interest in preventing the general public from being misled that a credential awarded by a non-ADA-recognized dental specialty board has the same requirements as a credential awarded by an ADA-recognized dental specialty board. This is a substantial interest.

Furthermore, § 651(h)(5)(A) directly and materially advances this interest. The purpose of § 651(h)(5)(A) is to prevent members of the public from thinking that credentials from non-ADA-recognized dental specialty boards convey the same assurance of competence and skill as a credential from an ADA-recognized dental specialty board. The real concern of the legislature in enacting this statute was that "credentials" issued for a fee by fly-by-night, Internet-based dental specialty "boards" would confuse the public into thinking that they were equivalent to a bona fide credential issued by an ADA-recognized or equivalent dental specialty board. (Pls.' Mot. at 6–7; Compl., Exs. D–J.) The legislature's solution was to ban advertisement of any credential that is not awarded by a dental specialty board that is recognized by either the ADA or the Dental Board. This solution does directly and materially advance the State's purpose. Whether it does so in a manner more restrictive than necessary is the inquiry under the last part of the *Central Hudson* test.

The Supreme Court has emphasized that the final element of the *Central Hudson* inquiry is not a least restrictive means analysis. *Bd. of Trs. v. Fox*, 492 U.S. 469, 479–480, 109 S.Ct. 3028, 3034–3035, 106 L.Ed.2d 388 (1989). Rather, defendants must demonstrate "a reasonable fit between the legislature's ends and the means chosen to accomplish those ends. The fit need not be perfect nor the single best to achieve those ends, but one whose scope is narrowly tailored to achieve the legislative objective." *Pain Management*, 353 F.3d at 1111 (quoting *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 632, 115 S.Ct. 2371, 2380, 132 L.Ed.2d 541 (1995)). It is within the legislature's discretion to choose between narrowly tailored means of regulating commercial speech, and a court will not second-guess such a choice. *Id.* (citing *Fox*, 492 U.S. at 479, 109 S.Ct. at 3034).

In *Pain Management*, the Ninth Circuit ruled in an alternative holding that even if the statute did not regulate only inherently misleading speech it would still survive First Amendment scrutiny under the remainder of the *Central Hudson* test. The *Pain Management* court determined that the mechanism set up by § 651(h)(5)(B) to screen use of the term "board certified" in physician advertising was narrowly tailored to achieve the State's interest in eliminating misleading uses of the term "board certified" in physician advertising. *Id.* While the court acknowledged that less restrictive alternatives existed, such as freely allowing use of the term "board certified" accompanied by a disclaimer, it applied the Supreme Court's teaching in *Fox* that the *Central Hudson* test is not a least restrictive means inquiry and recognized that the statute at issue represented a reasonable fit between the legislature's purpose and the means chosen to accomplish that purpose. *Id.*

Important to the *Pain Management* court's analysis under this part of the *Central Hudson* test was the salient fact that § 651(h)(5)(B) restricts only use of the term "board certified" and does not restrict all advertisement of credentials awarded by non-recognized medical specialty boards. *Id.* The court specifically noted that the defendants in that case had

conceded that an AAPM member could advertise that he or she is a Diplomate of AAPM, but simply could not use the words "board certified" in the advertisement. *Id.*

Defendants in this case now argue that § 651(h)(5)(A) is identical in all material respects to the statute at issue in *Pain Management*, and seek to take advantage of the *Pain Management* holding free of the critical concessions offered to secure that holding. But the two statutes are clearly different. The statute in this case forbids dentists from advertising any dental specialty credential not recognized by the ADA or the Dental Board, and is therefore distinctly broader in scope than the statute in *Pain Management*. In light of this critical distinction, one that the Ninth Circuit highlighted in the *Pain Management* opinion, the outcome of the reasonable fit analysis in this case has not been foreordained by *Pain Management*.

Section 651(h)(5)(A) is not narrowly tailored and is more extensive than necessary to achieve the State's interest in preventing misleading advertising of dental specialty credentials. Prohibiting the advertising of any credential that is not recognized by the ADA or the Dental Board or awarded by a board with equivalent requirements is substantially overbroad. A disclaimer requirement would restrict far less speech than an outright prohibition on advertising these credentials. Defendants' concern about consumer confusion as to sponsorship could be addressed by requiring a disclaimer that AAID and ABOI/ID are not recognized by or affiliated with the ADA or the Dental Board. The goal of assuring that consumers are not misled about the educational requirements for AAID and ABOI/ID credentials could be achieved by requiring advertisements to list the educational requirements for those credentials or to direct consumers to an Internet website containing that information. *See Bingham II*, 100 F.Supp.2d at 1240–1241. At least in the context of the circumstances here, involving a legitimate professional organization and genuine credentials as opposed to a sham arrangement, these kinds of disclaimers should suffice to protect the State's interests. Defendants' own surveys accord with this conclusion.

While a court may not invalidate a statute that goes "only marginally beyond what would adequately have served the governmental interest," the statute in this case is "substantially excessive, disregarding far less restrictive and more precise means." *Fox*, 492 U.S. at 479, 109 S.Ct. at 3034 (internal quotation marks and citations omitted). Therefore, § 651(h)(5)(A) violates the First Amendment and must be invalidated.

### III.

Accordingly, the court finds and declares that § 651(h)(5)(A) is unconstitutional as applied to the advertisement of AAID and ABOI/ID credentials by dentists who have not completed a formal, full-time advanced education program that is affiliated with or sponsored by a university-based dental school and is beyond the dental degree at a graduate or postgraduate level. *See* Cal. Bus. & Prof.Code § 651(h)(5)(A)(ii)(I). The court will schedule a status conference in this case to allow the parties an opportunity to address the scope and timing of the injunctive relief plaintiffs have requested so that defendants may have an opportunity to develop an appropriate disclaimer. Plaintiffs' motion for summary judgment is GRANTED, and defendants' motion for summary judgment is DENIED.

IT IS SO ORDERED.